UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-20515
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MAURICE H. DOKE; LARRY W. BASS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

March 25, 1999

Before JOLLY and JONES, Circuit Judges, and SIM LAKE,[*] District
Judge.


EDITH H. JONES, Circuit Judge:

Maurice Doke and Larry Bass were convicted of conspiracy,
bank fraud, and two counts of making false statements to a bank,
all in connection with a $600,000 nominee loan on speculative real
estate.  On appeal, they raise twelve issues, the most significant
of which are the sufficiency of the evidence, potential juror bias,

_____

[*]District Judge of the Southern District of Texas, sitting by
designation.

and Doke's competence to stand trial.[1]  We affirm the district court's judgment.

## I. Facts

Doke was a real estate developer in Houston.  Bass was his attorney and had negotiated several of Doke's real estate transactions.  In 1984, one of Doke's entities sold a 200-acre tract of undeveloped land in north Houston to General Homes Corporation, retaining two options to buy back small parcels of it. The first option, pertaining to 6.028 acres, was set to expire on August 1, 1985.

On July 11, 1985, Bass notified General Homes that Doke would exercise his option to buy the land.  The purchase price would be nearly $788,000.  On July 19, Bass requested a $600,000 loan from Champions Point National Bank ("Champions") to pay for the land.  Champions approved the loan on July 30, and the next day, in a simultaneous closing, General Homes sold the land to a Doke entity, which sold it to Bass for the same price.  This prosecution arose from that loan. The government argues -- and the jury must have believed -- that Bass told Champions he was borrowing the money to buy the land from Doke, without revealing Doke's continued involvement with the land or the loan.

---

[1]We have reviewed each of the defendants' other arguments and find no reversible errors.

It is undisputed that Doke gave to Bass the $200,000 Bass used for the down payment. Every six months for the next two years, Doke sent to Bass the money Bass used to make each payment on the loan. By late 1987, however, the Houston real estate market and the stock market had crashed. Doke was no longer able to pay Bass for the loan payments. Just before the February 1988 payment was due, Bass asked Champions to restructure his loan by extending more credit and extending the repayment terms. In the letter making this request, Bass made no mention of Doke. Champions denied Bass's request, and Bass did not make the February 1988 loan payment. Later that year, Champions foreclosed on the property. In 1990, Champions failed and was taken over by the FDIC. Shortly thereafter, the property was sold for a loss.

When regulators took over the bank in 1990, they were unable to find Bass's credit file, in which they were especially interested because the loan was made to an insider and had not been repaid. At the time of the loan, Bass had been on the Champions board of directors. Doke had also been an insider because he was a significant shareholder.

The theory of the government's case is that Doke and Bass failed to disclose Doke's involvement in the loan because Champions could not have loaned the $600,000 directly to Doke without violating civil regulations. Under the limits of the loan-to-one-borrower rule, see 12 U.S.C. § 84, Champions could loan Doke only

3

about $40,000 more than he had already borrowed. It could, however, lend over $300,000 to Bass. Thus, when Bass borrowed the $600,000, Champions participated out $300,000 of the loan to Park 45 National Bank, a "sister bank" that had several directors in common with Champions.

Doke and Bass were indicted in July 1995. A jury trial was held in February and March 1997. They were found guilty on all four counts: one count of conspiracy under 18 U.S.C. § 371, one count of bank fraud under 18 U.S.C. § 1344, and two counts of making false statements to a financial institution under 18 U.S.C. § 1014.

## II. Sufficiency of Evidence

Doke and Bass argue that the evidence was insufficient to support their convictions on any count. The evidence will be sufficient to support the jury's verdict if "a rational jury could have found the essential elements of the crime beyond a reasonable doubt." United States v. Dupre, 117 F.3d 810, 818 (5th Cir. 1997), cert. denied, 118 S. Ct. 857 (1998).

As mentioned above, the government argues that Doke and Bass concealed Doke's involvement from Champions, and that the loan exposed Champions to the risk of being in violation of banking regulations. Doke and Bass contend that there was not enough evidence to show that Bass failed to disclose Doke's involvement to the bank. In addition, however, they argue that, even assuming

4

non-disclosure of Doke's involvement, this nominee loan could not have defrauded the bank because the bank received exactly the risk it bargained for: it knew Bass's credit-worthiness, knew what the money would be used for, and knew what collateral would secure the loan.

In order to prove bank fraud under 18 U.S.C. § 1344, the government must show that Doke and Bass

> knowingly executed, or attempted to execute, a scheme to defraud a federally-chartered or -insured financial institution. A scheme to defraud includes any false or fraudulent pretenses or representations intending to deceive others in order to obtain something of value, such as money, from the institution to be deceived. The requisite intent to defraud is established if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to himself.

United State v. Hanson, 161 F.3d 896, 900 (5th Cir. 1998). In this case, the crux is whether Doke and Bass had the intent to deceive and whether the financial gains and losses in the offing demonstrated a scheme to defraud. These are questions of fact, and "[a]ll credibility determinations and reasonable inferences are to be resolved in favor of the verdict." United States v. Willey, 57 F.3d 1374, 1380 (5th Cir. 1995).

Doke and Bass argue that Bass disclosed their partnership to the bank when he applied for the loan. They contend that several pieces of evidence, in addition to Bass's own testimony at

5

the trial, show that Bass made this disclosure. The loan file presented at trial was missing the documents that would prove the disclosure. Other documents in the file showed Doke's continued involvement. The files on Bass at other banks show that Bass was not concealing anything. Doke's payments to Bass were routed through Champions. Two bank officers testified they knew of Doke's involvement. Finally, Doke had sufficient credit available at another bank to eliminate any motive to circumvent the lending limits at Champions.

The government, on the other hand, presented testimony from the president of the bank, Ron Karel, who was also Bass's loan officer. Karel strenuously maintained that Bass did not reveal Doke's continued involvement with the loan. Although he knew that Doke was involved in the original sale of the land (selling it to Bass), Karel maintained he did not know Doke would be paying off Bass's loan. The loan application (not filled out by Bass but purportedly reflective of what he had told the bank) stated that Bass would repay the loan out of his "[p]ersonal income and sale of property." Furthermore, Karel testified that at the board of directors meeting where Bass's loan was approved, Bass commented: "This has got to be a good deal because, after all, I'm putting in $200,000 of my own money toward the purchase price of this land." Several other directors testified about the approval of the loan. Bobby Newman testified that he had seen no indication that Doke was

6

involved with the loan. Keith Franze testified that he did not know of Doke's involvement and would not have voted to approve the loan if he had known. Robert Russ testified that he "never heard" that Doke would be the one paying off the loan, but he admitted it had happened so long before trial he could not be sure he would remember if he had.

Aside from the documents in Bass's file at Champions, which were ambiguous because of their incomplete state, this was largely a swearing contest between Bass's and Karel's versions of events. Two bank officers testified that Karel knew of Doke's involvement with the loan. But Karel and the other directors who denied knowledge of Doke's involvement were subject to extensive cross-examination by Bass's able trial counsel. This court is not inclined to interfere with the jury's decision about witnesses' credibility when that issue was so squarely set before it.

In addition, the documents produced by both sides would not necessarily compel a reasonable juror to abandon a determination that Karel's story was more credible. Because Bass's file was missing when the FDIC took over Champions, the government presented a file reconstructed from a copy that had been made surreptitiously by an investigator several weeks before the takeover. Doke and Bass demonstrated at trial that some key documents were missing even from the reconstructed file. They argue that the passage of time and the suspicious disappearance of

7

the file[2] show that the file could not be trusted to reflect accurately what Bass had told Champions.  In addition, they point out that the FDIC had lost Bass's personal files about the transaction after it took custody of them.  Yet, the government presented evidence that, as early as 1986, when payments were still being made on the loan, Champions' files did not reflect Doke's involvement in the loan.[3]

Only a few weeks after the loan was made, Bass disclosed it to his personal bank, West Belt National Bank, characterizing his liability on the loan as contingent upon Doke's non-payment.[4] Bass and Doke argue that Bass would not disclose this to his own bank if he was simultaneously hiding it from Champions.  The government, however, presented evidence that Bass made the statement at a time when he was attempting to get a sizable loan from West Belt and needed to minimize his liabilities.

Doke and Bass also argue that it was obvious to Champions that Doke was involved in the loan because appraisals of the

_____

[2]Incidentally, the disappearance happened after Karel had left Champions.

[3]An examiner for the Office of the Comptroller of the Currency reviewed the Bass loan in 1986.  She testified that she would have included in her report any evidence that Doke had been involved with the loan had she found any in the files.  Another OCC examiner testified that in 1987 he found the Bass loan was substandard, because of Bass's questionable ability to repay, but saw no indication that it was a nominee loan.

[4]Bass's subsequent disclosures to West Belt characterized his liability on the Champions loan as direct.

8

property were directed to Doke's attention.  But these could be easily explained by Doke's role in the transaction as the intermediary between General Homes and Bass.  Later appraisals could be attributed to Doke's continued involvement in the general development of the land around the property.  Until July 1986, Doke retained an option to purchase back the second parcel of land involved in his original sale to General Homes.  Thus, the letter from a Doke entity in 1985 asking Champions to release its lien on a sliver of the property securing the loan to accommodate a realignment of planned streets could be explained by Doke's interest in the overall development.  Neither the appraisals directed to Doke nor the letter was sufficient to tell Champions directly what Doke's interest in the property, much less the loan, was.

Doke and Bass argue that Doke's payments to Bass revealed no intent to deceive.  Some of Doke's payments to Bass were drawn on Doke's accounts at Champions, meaning Champions processed the checks and theoretically could have seen notes on the checks referencing the location of the property.  Part of one payment was made as a cashier's check drawn on Champions, signed by Karel, and payable to Bass.  (The cashier's check did not note the purpose of the payment.)  The jury could have inferred, however, that Doke and Bass, through their experience and insider positions, knew that Champions would not likely connect Bass's loan payments (which were

9

always made from accounts at other banks) with the checks Champions was clearing from Doke's entities.

The situation with the original down payment was less clear, since it recognizably came from a Doke entity (though it was drawn on an account at an out-of-state bank). The check was deposited into the title company's account at Champions. Because Champions credited the title company's account before the check cleared, a bank officer must have seen the check to authorize credit against uncollected funds. This could give rise to the inference that a bank officer knew that the down payment to the title company involved with the loan came from a Doke entity. This inference, however, would not necessarily require a reasonable juror to conclude that Doke and Bass were not concealing Doke's involvement. See United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) (en banc) ("It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt."), aff'd on other grounds, 462 U.S. 356 (1983).

Finally, Doke and Bass argue that Doke's extensive credit line at another bank eliminated any motive to connive at getting a loan through Champions. This argument, however, can cut both ways. As a large shareholder and a director, Doke and Bass each had an interest in the success of Champions. Bass testified that he went to Champions because he wanted to help bring it business. The jury

10

could have inferred that their motivation was not simply to obtain credit for Doke, but to obtain it at Champions, where Doke could not have borrowed even $40,000.

In sum, taken in the light most favorable to the verdict, there was sufficient evidence for a reasonable juror to have found beyond a reasonable doubt that Doke and Bass intended to deceive Champions about Doke's continued involvement with the loan.

Separate from the issue of how much they concealed from the bank, Doke and Bass argue that the economic validity of the transaction underlying the loan precluded it from being fraudulent. They rely primarily on three cases discussing economic validity: United States v. Beuttenmuller, 29 F.3d 973 (5th Cir. 1994), overruled in part on other grounds by United States v. Gaudin, 515 U.S. 506 (1995); United States v. Schnitzer, 145 F.3d 721 (5th Cir. 1998); and United States v. Baker, 61 F.3d 317 (5th Cir. 1995).

We agree that the transaction in this case had economic substance and was not a sham. We also agree that a nominee loan is not illegal where there is no evidence that the transaction is concealed from the bank, and where the loan documents "make the relationship between the various transactions very clear." United States v. Grossman, 117 F.3d 255, 260-61 (5th Cir. 1997). See also United States v. Willis, 997 F.2d 407, 410 n.2 (8th Cir. 1993). This court has held, however, that fraudulent actions, such as concealing the identity of a silent partner in violation of banking

11

regulations, contravene § 1344. See United States v. Henderson, 19 F.3d 917, 923 (5th Cir. 1994). Further, the creditworthiness of the borrower is no defense against a § 1344 bank fraud conviction. See United States v. Saks, 964 F.2d 1514, 1519 (5th Cir. 1992); United States v. Parekh, 926 F.2d 402 (5th Cir. 1991).

The type of proof of fraud is what distinguishes the cases upholding bank fraud convictions from Beuttenmuller, Baker, and Schnitzer, which overturned such convictions. In the latter cases, the government could not prove that the defendants knew and concealed material information from the banks, so it attempted to draw an inference of fraudulent intent by proving the transactions were economic shams. This court disagreed with the government's characterization of the deals and necessarily found insufficient proof of intent to defraud. In cases like Henderson, Saks, Parekh -- and this one -- there was proof of intent to defraud irrespective of the economic substance of the transactions. See also United States v. Hanson, 161 F.3d 896, 900-01 (5th Cir. 1998). Because Doke's and Bass's failure to disclose Doke's involvement with the loan put the bank in violation of banking regulations, and a reasonable juror could have concluded beyond a reasonable doubt that they did fail to disclose Doke's involvement, the evidence was sufficient to support their convictions for bank fraud.

Doke and Bass's arguments about the false statement and conspiracy counts are not clearly differentiated from their

12

arguments about bank fraud, with the exception of the second false statement count. That count related to Bass's February 1988 letter asking for a restructuring of his loan. Doke and Bass argue that the last proof of Doke's involvement with the loan was his September 1987 payment to Bass; when Bass subsequently requested restructuring of the loan, he was acting only on his own behalf.

This defense contradicts the theory behind Bass's own testimony at trial, which was that his partnership with Doke was disclosed all along. What happened to this alleged partnership in early 1988? In fact, Bass testified at trial that he had "gone to Mr. Doke" about the refinancing of the loan. The jury was entitled to infer that Bass's payments to Champions stopped when Doke's payments to him stopped, and that this occurred because they were still both involved in repaying the loan. When Bass requested essentially a new loan in 1988, he was again failing to disclose his nominee status and Doke's involvement behind the scenes.

Finally, because there was sufficient evidence to conclude that Doke and Bass possessed the requisite intent to defraud, it follows that there was sufficient evidence for the jury to infer that they had the intent to conspire and agreed to engage in the fraudulent transaction.

### III. Juror Bias

Bass and Doke argue that the district court erred in not excluding four veniremembers for cause and in not holding a hearing

13

on the impartiality of three jurors who were discovered after trial to have possibly lied on their voir dire questionnaires.

Their first contention is meritless; the court did not abuse its discretion in deciding that these jurors' answers to questions about possible bias revealed no inability to judge the case fairly.

Appellants' additional contention fares no better. One juror responded "No" to the juror questionnaire question, "Have you been charged criminally, other than a traffic ticket?" In fact, he had been charged with misdemeanor assault in 1993, and convicted of misdemeanor driving while intoxicated in 1982 and 1988. Bass asserted that two other jurors had failed to disclose their prior involvement in civil lawsuits wholly unrelated to the parties in this case. The district court denied Bass's motion for new trial and belated motion for a hearing.

The district court's decisions are reviewed for abuse of discretion. See United States v. Wilson, 116 F.3d 1066, 1087 (5th Cir. 1997), rev'd as to another defendant on other grounds, United States v. Brown, 161 F.3d 256 (5th Cir. 1998) (en banc).

To obtain a new trial for juror bias, this circuit requires a party to meet the test of the plurality opinion in McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556, 104 S. Ct. 845, 850 (1984): "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire,

14

and then further show that a correct response would have provided a valid basis for a challenge for cause." See Wilson, 116 F.3d at 1086. Without more, these jurors' failures to disclose the information asserted by appellants does not raise a material question concerning actual or implied bias that would necessitate a removal for cause. Cf. United States v. Scott, 854 F.2d 697, 700 (5th Cir. 1988). Because the jurors' omissions of immaterial information would not have come close to furnishing grounds for their removal, the court did not abuse its discretion by denying a hearing. Cf. United States v. Boney, 977 F.2d 624, 634 (D.C. Cir. 1992) (allegation that juror was a felon, statutorily disqualified from jury service, and that he concealed his status during voir dire, required remand for hearing).

## IV. Doke's Competence to Stand Trial

Doke argues that the district court erred when it found he was competent to stand trial. This court will not reverse the district court's determination unless it is "clearly arbitrary or unwarranted" -- a species of clear error review -- but this mixed question of fact and law requires us to "re-analyze the facts and take a hard look at the trial judge's ultimate conclusion." United States v. Birdsell, 775 F.2d 645, 648 (5th Cir. 1985) (internal quotation omitted). A defendant is incompetent if he suffers from "a mental disease or defect rendering him ... unable to understand

15

the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(d).

The district court held a competency hearing in March 1996.  The government presented a psychological evaluation from Dr. Jerome Brown, a clinical psychologist who had interviewed and administered tests to Doke on two occasions the prior month.  Doke presented two expert witnesses: neuropsychologist Dr. Larry Pollock, who had evaluated Doke in January 1993 and twice since November 1995, and Dr. Ronnie Pollard, a psychologist who had regular contact with Doke as an intern at the hospital where Doke was hospitalized for three months in 1992.  Doke also presented two lay witnesses: his daughter and a friend of his who had been appointed his medical guardian when he was released from the hospital.

Doke does not press any inability to "understand the nature and consequences of the proceedings against him."  Indeed, Dr. Pollock said that Doke had "a fairly good understanding of what the charges are"; and Dr. Brown reported that Doke told him his attorney had told him he could receive "from one and a half to five years" if found guilty.

Instead, Doke claims that he was unable to assist properly in his defense because of memory lapses about the period of the loan transactions.  At the competency hearing, Doke argued that these memory lapses were the effect of a failed suicide

attempt by drug overdose and carbon monoxide poisoning that left him unconscious for several days and hospitalized for three months in 1992.[5] Dr. Pollock testified that Doke had a significant memory impairment that made it "very difficult for him to retrieve" stored memories. Although he was not surprised to hear that Doke was able to discuss many elements of the case after being shown old documents related to it, Dr. Pollock said that it would be impossible to tell whether the details in Doke's descriptions were the result of genuine cuing or jogging of his memory, or the result of confabulation, where a patient attempts, unconsciously or not, to fill in memory gaps with plausible scenarios and later perceives those reconstructed memories as true ones. Doke's daughter and medical guardian gave anecdotal examples of the deterioration they had seen in Doke's mental abilities, including difficulties he had recounting some aspects of his personal history and his various problems as a taxi driver.[6] In summation at the competency hearing, Doke's counsel explained that Doke was unable to assist in his defense because "he draws an absolute blank" on what agreements he made with Bass about the loans in 1985 and 1986. He also argued that this compromised Doke's ability to testify at trial, where his

---

[5]There were also some indications of a series of minor strokes preceding the suicide attempt, but the suicide attempt was described as the major factor in Doke's memory loss.

[6]Doke was unable to learn how to use the computer to receive radio dispatches in his taxicab, he had gotten in several accidents (though some were because of lack of sleep), and he sometimes got lost, even attempting to use a map.

frequent but truthful claims not to remember things would make him appear evasive.

On behalf of the government, Dr. Brown concluded in his evaluation that Doke had "some variability in his memory functioning," but "his overall ability to utilize his memory functions is still adequate and consistent with what might be expected from someone at his intellectual level." (All sides agreed that Doke was of above-average intelligence.) Dr. Brown said Doke had no difficulties in communicating, and he could understand questions and provide useful answers. Doke's deficits were very specific, leaving most of his mental functions reasonably intact and making it possible "to some extent" to "circumvent[]" the deficits. As for the events related to the loan, Dr. Brown concluded that while Doke "has trouble remembering many details of the actions and transactions," "he also remembers a great deal, is aware of his intentions and plans concerning this business at that time, and can even be reminded and sometimes remember details if he is provided with helpful information."

At the conclusion of the competency hearing, the district court concluded that Doke was competent to stand trial. Although he had obviously suffered some diminution of his abilities, his considerable intelligence before that meant he was not much worse off than many average defendants. This was especially true given that Doke was fifty-seven years old and being asked to remember the

18

details of transactions from ten years earlier.  The district court also noted that Doke had been able to defend himself successfully against some of the suits arising from his traffic accidents.

This court has previously held that amnesia by itself does not render a defendant incompetent; rather, the "circumstances of each individual case" must be considered.  See United States v. Swanson, 572 F.2d 523, 526 (5th Cir. 1978).  Several factors considered in Swanson apply here.  Doke was not precluded from taking the stand on matters within his memory by "some other pathological or psychological condition."  Id.  Doke would not benefit from a continuance because his long-term memory was not improving.  Id.  Information in documents held by the prosecution could help fill in some of the gaps in Doke's memory.  Id. at 527.  Furthermore, it is possible that restoration of Doke's memory would not "materially aid his defense."  Id.

In the context of this case, it is particularly noteworthy that someone with no mental defects very likely would have had reduced memory of ten-year-old financial transactions.

It is not dispositive that more defense experts examined Doke more often than did Dr. Brown[7] -- or that Dr. Pollock

---

[7]Doke's contention that Dr. Brown's report was entitled to less weight because it was not delivered from the witness stand is false.  Dr. Brown was available in the court room, and no defense attorney chose to cross-examine him.  See United States v. Birdsell, 775 F.2d 645, 651 (5th Cir. 1985) (duty to cross-examine and point out weaknesses in expert testimony is counsel's).

specialized in neuropsychology. Sometimes this court has found such reasons to support believing one side's experts. Yet those cases involved greater disparities in evaluation, where an all-or-nothing choice had to be made between experts.[8] Here, Dr. Pollard and Dr. Brown each acknowledged the general consistency of their evaluations. The difference in their conclusions is based on different perceptions of whether the defendant's memory of the alleged crime is crucial to legal competence.

After a hard look at the facts, this court does not believe the district court's finding of competence was "clearly arbitrary and unwarranted."

## V. Conclusion

There was sufficient evidence to support the guilty verdicts on each count. There was insufficient evidence of juror bias to require a new trial or a hearing. Doke was competent to stand trial. Appellants' other arguments lack merit. As a result, the judgment and sentences of the district court are **AFFIRMED**.

---

[8]In United States v. Dockins, 986 F.2d 888 (5th Cir. 1993), the defense expert concluded after two evaluations that the defendant had an I.Q. of 49 and bona fide memory loss. The governments experts concluded after fourteen interviews that the defendant's I.Q. was around 80 and he was faking memory loss. Similarly, in Birdsell, the defense and government experts disagreed about whether the defendant was faking his mental condition. See 775 F.2d at 649-50.

20