UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-20961
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GARY R. MATTHEWS; JOHN T. LUNDY,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Texas
(H-98-CR-491-2)
_____

January 28, 2002

Before DUHÉ, WIENER, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:[1]

The primary issue in this bank fraud case is the sufficiency of the evidence against Gary R. Matthews and John T. Lundy. They also base error on jury instructions and the admission of bank policies and of testimony claimed subject to the marital privilege. **AFFIRMED.**

I.

Calumet Farm, in Lexington, Kentucky, was a very prominent thoroughbred farm. Its prize stallion was Alydar, one of the top two or three stud stallions in the world during the late 1980s. From 1980 until 1991, Calumet was operated by Lundy, as president,

_____

[1] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

and Matthews, as financial officer and counsel. Lundy had "full discretionary management powers".

By 1987, Calumet was having substantial cash flow problems and difficulty keeping current its payments to its long-time lender, Citizens Fidelity of Lexington, Kentucky. Citizens Fidelity loan officers determined Calumet was losing monthly almost $1 million, as the thoroughbred industry was experiencing a downturn. When Calumet requested a loan increase to $30 million (from $25 million), Citizens Fidelity declined because of the size of the loan and Calumet's inability to generate sufficient cash flow to service it.

Consequently, Matthews and Lundy turned to Frank Cihak, vice chairman of First City National Bank in Houston, Texas. (In this case, Cihak was an unindicted coconspirator of Matthews and Lundy.[2]) In May 1988, Cihak brought Matthews to Houston to meet with First City's Energy Division to arrange financing for Calumet.

Prior to the meeting, Cihak informed the loan officers: the transaction was highly confidential; Cihak could vouch for the borrower's character; and normal due diligence was unnecessary. During the meeting, Matthews: listed Calumet's needs; requested the loan be made quickly; described that repayment would be made

---

[2]    Because of other criminal activities while First City's vice chairman, Cihak was twice convicted of conspiracy, bank fraud, wire fraud, misapplication of bank funds, making false statements to a financial institution, making false entries in bank records, and money laundering. *See **United States v. Cihak***, 137 F.3d 252 (5th Cir.), *cert. denied*, 525 U.S. 847, *and cert. denied*, 525 U.S. 888 (1998); ***United States v. Allen***, 76 F.3d 1348 (5th Cir.), *cert. denied*, 519 U.S. 838, *and cert. denied,* 519 U.S. 841 (1996).

2

from Calumet's cash flow – essentially, the seasonal sales of horses and breeding rights; and provided financial statements and appraisals of Calumet's thoroughbreds, which were essentially the loan collateral.

Williams, the primary officer for the Calumet loan, testified Matthews never disclosed Calumet's cash flow problems or its difficulty in making payments to Citizens Fidelity. On the other hand, Williams' supervisor, Falk, admitted on cross-examination he was told of such difficulty.

Matthews told First City the appraisals he provided at the meeting were prepared by Robert Fox of Associated Thoroughbred Projects, S.I. (ATPSI); he advised that Fox was an independent appraiser with no connection to Calumet. Matthews did not inform First City that Fox acted as an agent for, and earned most of his income from commissions paid by, Calumet. Citizens Fidelity loan officers testified Fox's appraisals were "excessive" and "inflated".

The First City loan officers were directed by Cihak to make no "real independent analysis" and basically to use the information provided by Matthews and Lundy. The officers were not to contact Citizens Fidelity, or Calumet's owners or creditors, and not to obtain third party appraisals of the thoroughbreds. Refraining from contacting the current lender was not unusual, but the totality of these restrictions was contrary to First City's normal practice. Had it not been for Cihak, First City would not have made the loan.

Approximately one week after the meeting with Matthews, First City offered Calumet a three-year term loan of $15 million, with a $20 million revolving line of credit (revolver). Quarterly, Calumet was to pay $750,000 in principal, plus interest. The loan was funded in August 1988.

Almost immediately, Calumet had problems servicing it. Calumet had to draw on the revolver to make the interest payments, was late providing financial statements and compliance certificates, was unable to pay down the revolver in October and November as required under the agreement, and made the quarterly principal payment by drawing on the revolver. The inability to pay down the revolver was significant, because it meant Matthews knew prior to the loan's funding that Calumet was not following its business plan submitted to First City and would be unable to generate cash flow sufficient to cover the payments as agreed.

In November 1988, Calumet requested an increase in the revolver to $50 million in order to pay insurance premiums on its horses. First City agreed to an increase to $31 million to protect its collateral. Matthews made assurances to First City that this was a one-time problem and Calumet would pay down the revolver by selling horses.

The primary loan officer at First City testified that, regarding the loan, he became aware Cihak was "making credit decisions ... without contacting any of the ... [loan] officers". Frequently, over the course of the loan, Cihak would negotiate directly with Matthews and Lundy regarding credit decisions without

4

any involvement by the loan officers and would overrule those officers' decisions or make decisions with which they disagreed.

In January 1989, the Energy Division loan officers began to learn of Calumet's efforts to sell stallions to Japanese investors and Cihak's efforts, through a different First City division, Capital Markets, to facilitate the sale. That February, as discussed below concerning business transactions involving Matthews, Lundy, and Cihak, Cihak approved a $2.5 million increase in Calumet's revolver. That July, at a meeting at Calumet between Matthews and Lundy and the loan officers, to discuss the troubled status of the Calumet loan, the loan officers learned: Cihak had been to Calumet the previous weekend; Cihak had agreed to permit Calumet to defer a payment due on 15 August; Matthews and Lundy felt that, because of their relationship with Cihak, the loan officers' decisions were irrelevant; Cihak was actively involved in Calumet's deal to sell stallions to the Japanese investors; and Cihak intended to keep the First City officers involved in that Japanese transaction separate from those involved in the Calumet loan.

In September 1989, Matthews provided a "Report of Mares Bred (1989)" to First City at its request; it listed mares bred with Alydar at Calumet. But, the report (in columnar format listing the name of the mare, location, dates, etc.) omitted the column listing the name of the mare's owner. The same report from Calumet's business files contained this column and listed Cihak as the owner of Lucinda Light.

5

Later that month, the loan officers attempted to amend the Calumet loan by: obtaining additional collateral; requiring specific future payments be made on the revolver; having the borrowing base reduced; and requiring further compliance reporting. In response, Matthews wrote Cihak discussing the proposals and requesting changes to the proposed amendments. The loan officers were unaware of Matthews' letter. Cihak agreed to Matthews' terms, informing the officers of the terms of the amendments — deferring certain payments and delaying payments on the revolver until 1 January 1990.

Shortly thereafter, Calumet failed to timely make the November 1989 principal payment. Later in November, Lundy informed the bank's officers that, in order to make the required payment, Calumet would borrow money from another lender. At this point, more than a year after the Calumet loan's funding, Calumet had not made a single payment from its cash flow, as initially promised.

Not surprisingly, communication between the loan officers and Matthews and Lundy "severely deteriorated" - Lundy never returned telephone calls, and contact with Matthews was limited. Calumet finally made the November payment on 2 January 1990, but failed to make the deferred revolver payments as agreed (following the September 1989 negotiations).

In January 1990, the Energy Division recommended to the loan review committee downgrading the Calumet loan to "substandard".[3]

---

[3] At First City, loans were classified as "performing", "other assets expressly mentioned", "substandard", and "doubtful". A less favorable classification resulted in more scrutiny by the loan

6

But, at a February loan review committee meeting with the Energy Division, Cihak made false statements concerning Calumet's credit.[4] The downgrade recommendation was not approved. That March, Cihak moved the Calumet loan to another First City division, which reported directly to Cihak and was headed by "one of Cihak's men" from his prior Chicago bank.

During these loan events, and as discussed below, Matthews, Lundy, and Cihak had several business dealings beneficial (at various times) to each of them. Three of those transactions were: Matthews arranged a transaction over New Year's Eve weekend 1988 (just prior to Cihak's approving the above-described $2.5 million increase in February 1989 to Calumet's revolver), which resulted in an approximate $1 million business deduction for Cihak against his 1988 taxes; Lundy gifted certain breeding rights to Cihak, worth $125,000 (also around the time of the $2.5 million revolver-increase); and as a favor to Cihak, Lundy borrowed $5.2 million to prevent a First City debtor from defaulting on a $140 million letter of credit.

In setting up the New Year's Eve weekend 1988 (NYE '88) transaction, Matthews in late 1988 told ECC, a company specializing in financing thoroughbred transactions: Cihak wanted to borrow from ECC; Cihak did not need to provide financial statements to

---

review committee, and classifying a loan as substandard required First City to increase its reserves to offset a potentially uncollectible debt (because of FDIC regulations).

[4]    It was considered very unusual for Cihak, as Vice Chairman, to attend a loan review meeting.

ECC, because Calumet would provide ECC the money to lend Cihak; and ECC would not be required to repay those Calumet-provided funds if Cihak defaulted on the ECC loan. In orchestrating the NYE '88 transaction, Matthews gave written instructions to Cihak regarding checks to write, deposits to make, and the use of overnight couriers.

On 30 December 1988, Cihak signed a note to ECC for $1,105,000, due 15 February 1989 at 12.5 percent interest. The next day, 31 December, ECC's $1,105,000 check to Cihak was deposited in his account. When ECC's check was deposited in Cihak's account, ECC's bank balance was only $96,000. Nevertheless, ECC's $1,105,000 check was paid by ECC's bank on 4 January 1989. That same day, two deposits totaling $1,105,000 were made to ECC's account, allowing ECC's check to Cihak to clear. Those deposits were a $460,000 check from Calumet and a $645,000 check from ATPSI (the company operated by the above referenced Fox, the horse appraiser, and Alan Krutchkoff). Both checks had the notation "loan".

Krutchkoff testified: ATPSI relied upon Calumet for approximately 75 percent of its income; he did not recall the loan but acknowledged signing the check; the check likely related to a year-end tax deduction; and ATPSI's bank balance was only $130,800 when the $645,000 check to ECC was written on 31 December 1988. Two checks (one for $210,000 and another for $435,000), both written by Cihak, were deposited into ATPSI's account on 4 January 1989, permitting ATPSI's check to ECC to clear. The checks

8

contained notations referring to an Alydar breeding season and the lease of a mare, the earlier referenced Lucinda Light.

On 2 March 1989, ATPSI was paid $300,000, leaving a "balance due" (after subtracting interest on the "loan") of more than $353,000 against the $645,000 check from ATPSI to ECC.[5] The same day, ATPSI sent $225,000 to Maricopa Ranch (Matthews was a director and the registered agent; Lundy was the representative listed on several financing statements).

An FBI financial analyst, who examined the bank records involving the NYE '88 transaction, testified as follows. The proceeds of the $1,105,000 check to Cihak funded itself, because it "was the first in a series of [check] transactions ... based on artificially inflated bank account balances ... supported by worthless checks". Cihak had $65,000 in his account on 30 December 1988, but that day wrote four checks totaling $1,305,000 – two payable to Calumet ($210,000 and $450,000) and two to ATPSI ($210,000 and $435,000). ATPSI wrote the $645,000 check to ECC on 31 December, based on Cihak's checks artificially inflating its account; along with ATPSI's check, Calumet's check to ECC permitted ECC's $1,105,000 check to Cihak to clear. The FBI analyst testified: "Were it not for either one of those deposits, [the

_____

[5] The source of the $300,000 paid to ATPSI is unclear. ATPSI received a wire transfer of $300,000 in March 1989. Krutchkoff wrote Lundy that August inquiring about Cihak and the Lucinda Light lease; both the letter and the transaction statement accompanying the letter attribute the $300,000 wire transfer as payments on the $645,000 "loan" from ATPSI to ECC. Krutchkoff's letter to Lundy was found during a search of the home of an associate of Cihak.

9

$1,105,000] check would have bounced, and then the other checks would have bounced as well".

As a result of the NYE '88 transaction, Cihak took a $1,305,000 business deduction on his 1988 tax return. Cihak also used some of the "funds" from the ECC $1,105,000 check to lease a mare, Stick to Beauty, to be bred with Alydar. The resulting foal was sold for $750,000 in October 1990, with Lundy acting as Cihak's agent for the sale. The funds were distributed: $671,688 to ECC; $34,365 to an insurance agency; and $43,746 to Cihak. Of the funds it received, ECC wired $531,862 to Calumet in December 1990, and Calumet wired $512,833 of those funds to repay a $650,000 loan made to Cihak by Lee Casty, a Chicago associate of Cihak. Earlier, on 1 September 1990, Cihak had received $650,000 from Casty and had wired $150,000 to Lundy and $500,000 to Calumet; Calumet used the money to make a First City loan payment while Lundy used the money to make an interest payment on the $5.2 million First City loan (Lundy's favor to Cihak, described below).

The second of three of the above referenced transactions involving Cihak, Matthews, and Lundy began in early 1989, when Calumet, in an agreement signed by Lundy and Cihak, provided Cihak with Secreto's 1989 breeding season. The purchase price was "$1.00 (one dollar and other good and valuable consideration)". John Ward, who in 1991 replaced Lundy as Calumet's president, testified that, in the equine business, such language equates with a gift.[6]

---

[6] According to Ward, Secreto was "one of the highest priced horses ever purchased". A breeding season lasts four to five months and gives exclusive breeding rights during that time.

10

In January 1989, the Secreto season was valued at approximately $125,000.

The third referenced transaction began in early 1990, when Lundy borrowed $5.2 million from First City's Dallas bank purportedly for stock in a Spanish resort and artwork. In fact, the funds went directly to another bank to pay debts of another First City customer, the Coca family.[7] The loan closed and was funded prior to First City's receiving all the paperwork. The loan was issued in the name of John T. Lundy and Lucille Lundy, his wife, but Mrs. Lundy never signed the loan agreement. Lundy signed her name, claiming she gave him written authority to do so. At trial, as discussed in part II.E., Lundy's former wife (they divorced in 1993) testified she did not recall giving Lundy that authority; however, she testified earlier to the grand jury she did not authorize anyone to sign her name to the loan agreement. At trial, she testified she had not lied to the grand jury.

When First City attempted in 1991 to collect on the $5.2 million loan, Lundy responded: the loan was "an accommodation to the bank"; "the bank used [him] to funnel money to the Coca family"; and First City had represented to him that the Coca family would pay the loan, the value of the collateral exceeded the loan,

---

[7] Cihak caused First City to execute a $120 million letter of credit to that bank on behalf of the Cocas. In early 1990, the Cocas needed $5.2 million to avoid default on debt owed to the other bank; if the Cocas defaulted, First City would lose $140 million. Cihak arranged for Lundy to borrow the $5.2 million and pressured Lundy to go through with the loan.

11

the collateral could be easily liquidated in the event of default, and First City would refinance Lundy's farm and equine loans.

Prior to this collection effort, Lundy attempted to use the accommodation to cause First City to extend more credit to Calumet. In the summer of 1990, Cihak arranged for Robert Richley, First City's president, to meet with Matthews and Lundy to discuss Calumet's request for more credit. Richley opposed extending more. While Matthews was explaining Calumet's situation to Richley, Lundy interrupted Matthews and said: "Look, we need help here. And we helped you in Dallas and we expect to get helped here". Richley responded he had no idea what Lundy was talking about and ended the meeting.

Other evidence of side dealings between Cihak, Matthews, and Lundy included Cihak's indebtedness to Calumet. A September 1989 memo from Matthews to Lundy discussing Calumet's cash flow problems suggested that Calumet not pressure Cihak on his debt to Calumet and either allow him to defer payment as long as he could help Calumet or offer partial debt forgiveness as "compensation or [a] commission" for extending further credit on First City's loan. Further, in early 1991, Lundy attempted to collect on a debt relating to the July 1984 purchase of a lifetime breeding right in Alydar (Cihak owned 25 percent of this right). As an accommodation, Lundy had not required payment during 1989 and 1990.

In May 1990, during a review of Calumet's compliance with First City's loan agreement, Calumet's accountants discovered a Calumet "loan" of $460,000 to ECC (the 4 January 1989 check

12

supporting, in part, the NYE '88 transaction) and reported it to First City.  Matthews immediately wrote First City:  "The loan to [ECC] was a tax financing transaction to enable an *individual* to lease a mare at the end of 1988.  Thus, Calumet did not actually lend the money to [ECC] but used [ECC] as a vehicle to add substance to the transaction".  (Emphasis added.)

Neither Richley (First City's president), Falk (the earlier-referenced Energy Division group manager who supervised the Calumet loan), nor any loan officer in that division knew Cihak was the unidentified "individual" involved in the transaction.  Had First City known that Cihak received either a substantial amount of money, or the Secreto season, or any other thing of value from Matthews or Lundy, Cihak might have been, among other things, terminated by First City.  There was no prohibition on bank customers doing business with their bankers, but bank policy precluded Cihak from doing any business with Calumet because he was involved in the approval of Calumet credit decisions.

Because of an internal investigation begun during late summer 1990 into Cihak-related transactions at First City, Cihak obtained an affidavit from Lundy in January 1991 explaining:  he had no business dealings with Cihak prior to 1988; the NYE '88 transaction involved "standard horse lease arrangements"; Cihak was given "no special consideration" in the deal; the leases "were not special arrangements"; and he sold a half interest in Hail Secreto to Cihak in the spring of 1990.

By mid-1990, Calumet's debt at First City was approximately $40 million, and Calumet asked for another $15 million. Instead, in October 1990, First City restructured the account into a term loan of $42 million, with the first payment of $15 million due February 1991. Calumet was unable to make the November 1990 interest payment but made the $15 million payment because of insurance proceeds from a horse's death. Meanwhile, the internal investigation at First City resulted in Cihak's forced resignation in October 1990.

In the spring of 1991, Matthews and Lundy were dismissed by Calumet. Lundy's replacement, Ward, testified: as of Matthews' and Lundy's dismissals, Calumet was almost $60 million in debt, with First City being the largest creditor (more than $28 million); and Lundy received millions that should have gone to Calumet. Calumet declared bankruptcy in July 1991.

When Lundy was arrested in 1999, a handwritten letter found in his briefcase recited, *inter alia*, his recollection of a 1997 interview with FBI Agents. The letter: revealed Lundy lied to the Agents about his wife's signature on their 1990 and 1991 tax returns; requested the letter's recipient to obtain "a paper" (an affidavit) from Lundy's ex-wife stating either her signature was on the $5.2 million loan agreement or Lundy had power of attorney to sign her name; expressed Lundy's hope her statement would end the investigation or "prove [the $5.2 million loan] was an arm's length deal"; directed the recipient to call Lundy's ex-wife to assure her she would not get in trouble for signing an affidavit, an affidavit

14

would save him, and it would keep her out of trouble. The letter further detailed Lundy's 1991 affidavit to First City, prepared for Cihak, (describing it as "close to right") and discussed other business deals with Cihak, including a mining deal in Illinois.

Following a jury trial in early 2000, Matthews and Lundy were convicted of bank fraud, in violation of 18 U.S.C. §§ 1344 & 1366; bank bribery, in violation of 18 U.S.C. § 215; making false statements to a financial institution, in violation of 18 U.S.C. § 1014; and conspiracy to commit bank fraud and bribery and to make false statements to a financial institution, in violation of 18 U.S.C. § 371. Matthews and Lundy's October 2000 sentences imposed, *inter alia*, 21 and 54 months imprisonment, respectively, and approximately $20 million restitution by each of them.

## II.

Matthews and Lundy claim insufficient evidence for each conviction and contest the jury instruction on false statements. In addition, Matthews asserts the court erred by not instructing on the defense of good faith and by admitting evidence of Cihak's banking policies violations; Lundy, that it erred by admitting his ex-wife's testimony concerning marital communications.

## A.

"[A] defendant seeking reversal on the basis of insufficient evidence swims upstream". *United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997), *cert. denied*, 523 U.S. 1071 (1998). Neither Matthews nor Lundy testified. Nor, other than through cross

examination, did they present evidence in their defense. Of course, the burden of proof rests with the Government.

Evidence is sufficient to convict if, when viewed in the light most favorable to the verdict, "a rational jury could have found the essential elements of the crime beyond a reasonable doubt". *United States v. Dupre*, 117 F.3d 810, 818 (5th Cir. 1997), *cert. denied*, 522 U.S. 1078 (1998). It is unnecessary to disprove alternative theories because the jury's verdict can be supported by "reasonable constructions of the evidence". *United States v. Peterson*, 244 F.3d 385, 389 (5th Cir.), *cert. denied*, 122 S. Ct. 142 (2001). Restated, all reasonable inferences are drawn in favor of the verdict. *E.g., United States v. Soape,* 169 F.3d 257, 264 (5th Cir.), *cert. denied*, 527 U.S. 1011 (1999).

1.

To prove a conspiracy violative of 18 U.S.C. § 371, the Government must show: an agreement between at least two persons to commit a crime; the defendant knowingly joined the conspiracy; and at least one overt act by a conspirator in furtherance of the conspiracy. *Cihak*, 137 F.3d at 259-60. The jury may infer from circumstantial evidence the existence of a conspiracy. *See United States v. Burton*, 126 F.3d 666, 670 (5th Cir. 1997). And, once the Government produces evidence of a conspiracy, only slight evidence is needed to connect a defendant to it. *United States v. Jensen*, 41 F.3d 946, 954-55 (5th Cir. 1994), *cert. denied*, 514 U.S. 1101 (1995). If found to be a member of a conspiracy, a defendant is liable for all substantive offenses committed in furtherance of it,

16

even if he is unaware of those specific offenses. ***United States v. Phillips,*** 219 F.3d 404, 417 (5th Cir. 2000); ***Jensen***, 41 F.3d at 955.

The Government notes the following evidence in support of the conspiracy convictions. Cihak interfered with the loan officers' attempts to secure payment on the Calumet loan by circumventing them and dealing directly with Matthews and Lundy. Following the downgrade recommendation for the loan, Cihak's false statements to the loan review committee and Cihak's eventual transfer of the loan to another division, controlled by Cihak's associate, are acts in furtherance of the conspiracy. In exchange, Cihak was provided benefits: when Matthews structured the NYE '88 transaction to provide Cihak with a $1,105,000 tax deduction while concealing Matthews, Lundy, and Calumet as the source of the funds; when Cihak was gifted the Secreto breeding season; and when Lundy obtained the $5.2 million loan as a favor to Cihak.

Because Cihak approved a $2.5 million increase in the Calumet loan shortly after the Secreto gift and the NYE '88 transaction, the Government contends the jury could infer the existence of the conspiracy. Also, the Government contends evidence of the conspiracy is found in Matthews' September 1989 memo to Lundy suggesting Lundy bribe Cihak by deferring his debt to Calumet in exchange for favorable treatment on the Calumet loan.

Defendants state the conspiracy charge is based on the acts charged in the bank fraud, bank bribery, and false statements counts, in addition to two other acts: the $5.2 million loan to

17

Lundy and the Secreto season gift. Their contentions concerning the substantive charges are discussed below. As to the other two acts, Defendants assert: the evidence did not establish First City's knowledge or understanding as to the $5.2 million loan or the validity of Mrs. Lundy's signature and there is no evidence that Lundy or Matthews attempted to hide the loan from First City; and evidence concerning the Secreto season did not establish it was, in fact, a gift, as opposed to part of other transactions between Calumet and Cihak.

There was sufficient evidence for the conspiracy convictions, as further shown below. Viewing the earlier described evidence, and drawing all reasonable inferences in the light most favorable to the verdict, a rational jury could have found, beyond a reasonable doubt, the elements for a conspiracy involving Matthews, Lundy, and Cihak to commit bank bribery and fraud, and to make false statements to a financial institution.

2.

To establish bank fraud violative of 18 U.S.C. § 1344, the Government must prove Matthews and Lundy knowingly executed, or attempted to execute, a scheme to defraud a federally-chartered or federally-insured financial institution. *United States v. Doke*, 171 F.3d 240, 243 (5th Cir.), *cert. denied*, 528 U.S. 907 (1999). The requisite intent is established by proving the defendant acted with the specific intent to deceive to bring about financial gain to himself. *United States v. Saks*, 964 F.2d 1514, 1519 (5th Cir. 1992). The scheme to defraud may include false representations

18

intended to deceive the institution in order to obtain money from it. *See **United States v. Hanson***, 161 F.3d 896, 900 (5th Cir. 1998) (quoting ***Saks***, 964 F.2d at 1518). Any false representation must be "material" — capable of influencing the institution's decision-making process. *See **Neder v. United States***, 527 U.S. 1, 25 (1999); ***United States v. Moser***, 123 F.3d 813, 826 n.11 (5th Cir.), *cert. denied*, 522 U.S. 1020, *and cert. denied*, 522 U.S. 1035 (1997), *and cert. denied*, 522 U.S. 1092 (1998).

Modeled after the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, the bank fraud statute is interpreted in the light of the precedent interpreting those statutes. ***Saks***, 964 F.2d at 1520-21. A "representation may be false when it constitutes a half truth or effectively conceals a material fact, provided it is made with the intent to defraud". ***Moser***, 123 F.3d at 826; *see also **Blachly v. United States***, 380 F.2d 665, 673-74 (5th Cir. 1967) ("[A] scheme may be fraudulent even though no affirmative misrepresentation of fact be made. The deceitful *concealment of material facts* may also constitute actual fraud". (citations omitted; emphasis added)).[8]

---

[8]    Most circuits agree false representations or statements include *concealment* of material facts. *See, e.g., **United States v. Colton,*** 231 F.3d 890, 901 (4th Cir. 2000) ("deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or avert further inquiry into a material matter" sufficient proof for scheme to defraud); ***United States v. Molinaro,*** 11 F.3d 853, 861 (9th Cir. 1993), *cert. denied*, 513 U.S. 1059 (1994) (concealment of nature of a financial transaction part of scheme to defraud); ***United States v. Goodman,*** 984 F.2d 235, 240 (8th Cir. 1993) (scheme to defraud shown by "nondisclosure manifesting an intent to defraud"); ***United States v. Olatunji***, 872 F.2d 1161, 1167 (3d Cir. 1989) (false representations include "deceitful statements of half truths or the concealment of material

19

Of course, fraud claims must be based on misrepresentations of material fact, not opinion.  *See* **Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.**, 784 F.2d 674, 678-79 (5th Cir. 1986) (civil suit alleging common law fraud).  Matthews contends that, even if the Calumet business plan was false, it does not constitute fraud because it was merely an expression of opinion.  Defendants contend First City was informed of Calumet's cash flow problems, and Matthews asserts the loan officers' testimony reflects they felt Matthews believed what he told First City during the pre-loan period and they could not conclude he intentionally misled them.

Defendants maintain that, absent a duty to disclose, a fraud conviction cannot be based on the failure to disclose information.  *See* **Chiarella v. United States**, 445 U.S. 222, 235 (1980).  Defendants contend there is no duty to disclose a customer's dealings with his banker; rather, the burden of disclosure is on the banker.  Further, they assert the omission of the owners' names on the Report of Mares Bred was consistent with Calumet's confidentiality policy for its customers.

The Government counters that:  the bank, mail, and wire fraud statutes do not require that there be a duty to disclose; the scheme to defraud is a "departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life

facts") (quoting **United States v. Allen**, 554 F.2d 398, 410 (10th Cir.), *cert. denied*, 434 U.S. 836 (1977)); **United States v. Walker**, 871 F.2d 1298, 1308 (6th Cir. 1989) (statement containing half truths or concealing material fact is false); **United States v. Sawyer**, 799 F.2d 1494, 1502 (11th Cir. 1986), *cert. denied*, 479 U.S. 1069 (1987) (scheme to defraud includes false representations or concealing material facts).

20

of the community". *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987); *see also United States v. Curry*, 681 F.2d 406, 410 (5th Cir. 1982). The Government also cites two cases from other circuits which reaffirm the principle that the bank, mail, and wire fraud statutes do not require a duty to disclose imposed by statute or regulation. *See Colton*, 231 F.3d at 904; *United States v. Morris*, 80 F.3d 1151, 1161 (7th Cir.), *cert. denied*, 519 U.S. 868 (1996).

As with the conspiracy charge, the evidence is more than sufficient for bank fraud. For example, the request for "confidentiality", the representations during the pre-loan period that Fox was an independent horse appraiser, Matthews' promises to sell horses during negotiations over the extension of more credit to Calumet, and Matthews' concealment of Calumet's dealings with Cihak are sufficient evidence for a rational juror to find, beyond a reasonable doubt, concealment of material facts constituting misrepresentations intending to deceive First City for the purpose of obtaining money for Calumet. *See Dupre*, 117 F.3d at 819-20.

### 3.

A defendant makes a false statement to a financial institution, violative of 18 U.S.C. § 1014, if he made a false statement to influence in any way the actions of a financial institution with regard to its lending activities. *See United States v. Blocker*, 104 F.3d 720, 733 (5th Cir. 1997). Section 1014 applies to any false statement made to a financial institution involving credit, not just statements made prior to and at the time

21

of funding. ***United States v. Kindig***, 854 F.2d 703, 706 (5th Cir. 1988). Unlike the bank fraud statute, the false statement need not be material; § 1014 proscribes a falsehood that influences, in any way, the bank's actions. *See **United States v. Wells***, 519 U.S. 482 (1997).

The Government contends: the intentional concealment of Matthews' arrangement of the $1,105,000 tax deduction for Cihak (NYE '88 transaction), including advising that an "individual", rather than Cihak, received $460,000 from Calumet in connection with the NYE '88 transaction, was a false statement intending to influence the bank's lending activity; Cihak was instrumental in approving the Calumet loan and overruling the decisions of the loan officers; and concealing the benefits Matthews and Lundy provided Cihak was essential to the continuation of their favorable treatment because the bank might have fired Cihak had it known of the benefits he received from Calumet, Matthews, and Lundy.

Matthews and Lundy contend: the omission was either not intentional or not intended to deceive First City; the bank policy required reporting by the banker, not the customer, of preferential treatment; and not only was there no evidence that Matthews or Lundy knew of this policy, but also there was no evidence that the NYE '88 transaction constituted preferential treatment. Further, Matthews' response (using the term "individual", instead of naming Cihak) to First City's inquiry about the Calument $460,000 loan concerning the NYE '88 transaction was in a form commonly used by CPAs, and as a lawyer, Matthews had a duty of confidentiality and

22

loyalty to Cihak as his client. Finally, because the transaction was recorded (by equine industry standards), there was no evidence Matthews or Lundy attempted to hide the transaction.

The evidence relating to the § 1014 charge is described earlier. As with the evidence for bank fraud, there is sufficient evidence for a rational juror to find, beyond a reasonable doubt, that, in violation of 18 U.S.C. § 1014, Matthews and Lundy made false statements to First City with the intent to influence it.

4.

Bank bribery, violative of 18 U.S.C. § 215, consists of corruptly giving or promising something of value to, among others, an officer or employee of a federally-insured financial institution "with intent to influence or reward" him regarding bank business. 18 U.S.C. § 215(a). The Government contends: the $1,105,000 tax benefit provided to Cihak (NYE '88 transaction) was a reward for his involvement in increasing the Calumet loan, especially because Cihak approved a $2.5 million increase shortly thereafter; and an explicit promise was not required, because the jury could infer Cihak accepted the benefit "knowing ... it was payment related to his using his influence ... as specific opportunities arose". *United States v. Coyne*, 4 F.3d 100, 111 (2d Cir. 1993), *cert. denied*, 510 U.S. 1095 (1994). Defendants respond that the evidence did not reflect a corrupt intent, but rather the NYE '88 transaction was a legitimate business transaction financed in a tax advantageous way and handled by a third-party attorney that was not concealed.

23

The evidence was far more than sufficient for a rational juror to find bank bribery beyond a reasonable doubt. Based on the strong causal connection between the NYE '88 transaction and Cihak's increase in Calumet's loan and the gift of the Secreto season, a rational juror could find that Matthews and Lundy provided Cihak with benefits with the intent of rewarding him for favorable treatment on the Calumet loan.

B.

Defendants contest the jury instruction defining the 18 U.S.C. § 1014 crime of making a false statement to a financial institution. Jury instructions are reviewed only for an abuse of discretion. *E.g.*, **United States v. Pankhurst**, 118 F.3d 345, 350 (5th Cir.), *cert. denied*, 522 U.S. 1030 (1997). At issue is "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them". **United States v. McKinney**, 53 F.3d 664, 676 (5th Cir.), *cert. denied*, 516 U.S. 901, *and cert. denied*, 516 U.S. 903, *and cert. denied*, 516 U.S. 970 (1995) (quoting **United States v. Stacey**, 896 F.2d 75, 77 (5th Cir. 1990)). The instruction read in part:

> A person makes a false statement under this statute if he fails to disclose material information to a federally insured bank in connection with a loan transaction.

Matthews and Lundy contend: the court erred by failing to include language they claim is required by **Dupre**, 117 F.3d at 819, and **United States v. Trice**, 823 F.2d 80, 86 (5th Cir. 1987) ("section 1014 [*may* be violated by] the failure to disclose

24

material information *needed to avoid deception* in connection with a loan transaction" (emphasis added)); and such omitted language requires the jury to find an affirmative statement rendered deceptive by concurrent omissions or an omission when there is a duty to speak. Along this line, Defendants also base error on the instructions failing to state that, as discussed *supra*, concerning bank fraud, intentional omissions without a duty to disclose did not constitute a false statement.

The Government first correctly observes that neither Defendant objected to the omission of the phrase "needed to avoid deception" nor suggested its inclusion. Second, the Government responds that intentional omissions of material facts can constitute a violation of § 1014.

Matthews and Lundy each made general objections to the instruction, claiming intentional omissions without a duty to disclose did not constitute a false statement. Indeed, Lundy's counsel even stated that the exact phrase now urged as correct did not make a "good jury instruction[]". Consequently, any issue relating to the omission of the "needed to avoid deception" phrase is reviewed only for plain error. *E.g., **United States v. Heath***, 970 F.2d 1397, 1407 (5th Cir. 1992), *cert. denied,* 507 U.S. 1004 (1993); *cf. **United States v. Polasek***, 162 F.3d 878, 883 (5th Cir. 1998).

Plain error occurs where a "clear" or "obvious" error affects substantial rights. *See **United States v. Olano***, 507 U.S. 725, 732-35 (1993); **United States v. Calverley**, 37 F.3d 160, 162-64 (5th

Cir. 1994), *cert. denied*, 513 U.S. 1196 (1995). Even then, we have discretion whether to correct the error and, generally, will not do so unless it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings". *Olano*, 507 U.S. at 736 (internal quotation marks omitted).

Although both *Dupre* and *Trice* use the "need to avoid deception" language, it is not "clear" or "obvious" that the language was required in the instruction. In any event, the § 1014 instruction required finding Defendants intentionally failed to disclose material information to a federally insured bank regarding a loan transaction *for the purpose of influencing its lending activities*, which is more than the statute requires. *See* 18 U.S.C. § 1014. There was no error, plain or otherwise.

With respect to Defendants' remaining contentions concerning the § 1014 instruction, and as discussed above, an intentional omission of material fact can constitute a false statement if made for the purpose of influencing a federally-insured bank's lending activities. *Doke*, 171 F.3d at 246 (intentional failure to disclose defendant's status as nominee in loan transaction); *Dupre*, 117 F.3d at 819; *United States v. Waldron*, 53 F.3d 680, 682 n.4 (5th Cir. 1995) (rejecting literal truth defense because concealed fact effected the loan transaction), *vacated on other grounds*, 516 U.S. 928 (1995).

The instruction, as a whole, is a correct statement of the law. Consequently, the court did not abuse its discretion in its § 1014 false statements instruction.

26

Matthews also contends the district court erred in failing to instruct on the defensive theory of good faith. Again, we review for abuse of discretion. Not giving a requested instruction is an abuse of discretion if: the requested instruction was substantially correct; it was not substantially covered in the charge given; and the refusal impaired the defendant's right to a fair trial. *E.g., United States v. Webster*, 162 F.3d 308 (5th Cir. 1998), *cert. denied*, 528 U.S. 829 (1999).

Matthews asserts: good faith is a complete defense to charged intent to defraud; the court's instruction on "knowingly" did not substantially cover what was requested in his good faith instruction; and a defendant is entitled to an instruction on as many defensive theories as are raised by the evidence. The Government responds: a good faith instruction is not required if the jury is instructed properly on the elements of an offense, including the requisite mental state; the given instructions "fairly and adequately" covered the good faith issue, *United States v. Daniels*, 247 F.3d 598, 601 (5th Cir.), *cert. denied*, 122 S. Ct. 288 (2001); and throughout the trial, Matthews presented the good faith defense to the jury.

There was no abuse of discretion. The instructions substantially covered the requested instruction by defining and/or explaining the following terms: "knowingly" (conspiracy, bank fraud, false statements), "willfully" (conspiracy), "corruptly" (bank bribery), and "material" and "purpose of influencing" (false

27

statements).  Further, Matthews was fully able to present his defense to the jury during his cross-examination of First City's loan officers and his closing argument.  *See* **United States v. Chaney**, 964 F.2d 437, 445-46 (5th Cir. 1992) (citing **United States v. Rochester**, 898 F.2d 971, 978 (5th Cir. 1990)) (no abuse of discretion when jury instructed as to the terms "knowingly" and "intent to defraud" and defendant able to argue good faith before jury).

### D.

Matthews bases error on the admission of Cihak's banking policy violations.  We review for abuse of discretion.  **United States v. Harvard**, 103 F.3d 412, 422 (5th Cir.), *cert. denied*, 522 U.S. 824 (1997); *see* FED. R. EVID. 103.

Matthews states correctly that violation of a civil regulation cannot be used to establish criminal conduct.  *See* **United States v. Christo**, 614 F.2d 486 (5th Cir. 1980).  On the other hand, he fails to address the fact that evidence of such violations is admissible to show motive or intent.  **Harvard**, 103 F.3d at 422; **United States v. Parks**, 68 F.3d 860, 866-67 (5th Cir. 1995), *cert. denied*, 516 U.S. 1098, *and cert. denied*, 516 U.S. 1133, *and cert. denied*, 516 U.S. 1151 (1996).

The court did not abuse its discretion by admitting evidence of Cihak's banking policy violations.  The evidence concerning First City's policies prohibiting its officers from entering into certain business relationships with borrowers was offered to show Matthews' and Lundy's motive for concealing from First City their

28

various deals with, and benefits to, Cihak.  Furthermore, the court gave a cautionary instruction regarding bank policies to prevent "bootstrapping" policy violations into a conviction.  **United States v. Cordell**, 912 F.2d 769, 777 (5th Cir. 1990).

### E.

Lundy challenges the district court's allowing testimony by his former wife, Lucille Drinkwater, about her confidential communications with him.  Again, the admission of evidence is reviewed for abuse of discretion.

There are two distinct aspects of the marital privilege:  one spouse cannot be compelled to testify against the other; and a spouse cannot testify about confidential communications made during the marriage.  **United States v. Ramiriz**, 145 F.3d 345, 355 (5th Cir. 1998).  The first aspect ends on termination of the marriage.  **United States v. Crockett**, 534 F.2d 589, 604 n.17 (5th Cir. 1976).  Lundy and Drinkwater divorced in 1993, long before trial.  Therefore, he can only contest testimony about confidential communications.

The privilege "extends only to utterances, and not to acts".  **Pereira v. United States**, 347 U.S. 1, 6 (1954).  Drinkwater's testimony regarding whether she signed the $5.2 million loan did not involve any confidential communication, so any objection by Lundy as to that testimony is meritless.

In addition, Drinkwater was questioned about her prior inconsistent grand jury testimony concerning statements by Lundy.  The court properly noted such testimony was introduced to impeach

29

Drinkwater rather than as substantive evidence.  There was no abuse of discretion in admitting prior grand jury testimony for that purpose.  *See* FED R. EVID. 801(d)(1); *see also, e.g.,* **Howard v. Gonzales**, 658 F.2d 352, 356 (5th Cir. Unit A 1981).

III.

The evidence was more than sufficient for a rational juror to find, beyond a reasonable doubt, that Defendants were guilty of conspiracy, bank fraud and bribery, and making false statements to a bank.  Regarding the challenged jury instructions, the court did not err in giving the one on false statements and in refusing the one on good faith.  Finally, it did not abuse its discretion in admitting evidence concerning banking policy violations and claimed marital communications.  Therefore, the judgment is

**AFFIRMED.**