# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 25, 2024

Lyle W. Cayce
Clerk

———————————

No. 22-11035

———————————

United States of America,

*Plaintiff—Appellee*,

*versus*

Thomas John Boukamp,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:20-CR-165-1

———————————————————————

Before Clement, Southwick, and Ho, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

Following a three-day trial at which Thomas John Boukamp represented himself, a jury found Boukamp guilty on sixteen counts, and he was sentenced to life in prison. Because each of the nine issues Boukamp raises on appeal is either meritless, harmless error, or foreclosed by binding precedent, we AFFIRM.

No. 22-11035

I.

A.

This case concerns a sexual relationship between a 13-year-old girl, M.,[1] and a 19-year-old male, Boukamp, that began online and became in-person when Boukamp picked up M. at her middle school in Texas and drove her back to his house in Michigan. The parties present this relationship in radically different lights. Boukamp describes "an emotionally immature young man and a minor girl bonded over dark, socially unacceptable [sexual] fantasies" who "fell in love" and "hatched a plan—together—to escape their circumstances." The government describes a dangerous sexual predator who found a 13-year-old girl "suffering from depression and a difficult life at home" in an online chatroom, "tortured her psychologically and emotionally, and blackmailed her with explicit photos and videos she sent him . . . until she became resigned to his harassment and agreed to leave her home with him."

For his entire life, Boukamp struggled socially and never really fit in. He did well academically, however, and in the spring of 2020, was a student at Michigan State University. Due to the COVID-19 pandemic, Boukamp was taking classes online and living alone at his family's lake house in Michigan. Shortly after the semester started, however, Boukamp dropped all of his courses and instead spent his time on the online chat services Omegle and Discord—specifically, in chatrooms labeled for those with interests in "death" or "kidnapping."

Around April 2020, Boukamp met M. in an Omegle chatroom about death, and they began chatting daily over Discord for hours at a time. M. told

_____

[1] Although the victim chose to use her real name at trial, the parties' briefs refer to her as "M." for privacy purposes. We use the same convention in this opinion.

Boukamp that she was thirteen and lived in Lubbock, Texas. She also shared that she was depressed, had a difficult home life, had cut herself, and had a kidnapping and rape fantasy. From the beginning, the conversations between M. and Boukamp were often sexual in nature. As early as April 28, 2020, and continuing over the course of the ensuing months, M. sent Boukamp explicit photos and videos of herself.

The record evidence from this period shows that M. felt trapped. She wrote in her journal that she wished Boukamp was "gone forever." And she told Boukamp via chat that "I just wanna be a 13 year old" and "live a normal [expletive] life," "not hav[e] a guy want to kidnap me" or be "on the [expletive] edge of a mental breakdown," and that "I dread the times I see a notification from you." But despite explaining that she was "not ready to love someone," she recognized that Boukamp could not "accept that" and that he "roll[ed] in self pity . . . and [took] it out on young innocent girls." M. told Boukamp that he was "evil" and a "psychopath" who "traumatized" and "manipulate[d]" her, yet she feared what Boukamp was "capable of" and felt she couldn't "stop talking to [Boukamp] cause [he'd] do something." Indeed, Boukamp had threatened to "torture [M.] psychologically" and that he would "find [M.]" and "kill [her] parents."

At the end of July 2020, M. attempted suicide by swallowing a bottle of Tylenol. M. survived, but her stepmother told M. that she hoped M.'s next suicide attempt would be successful. When M. told Boukamp that she had been sent to the hospital because she "tried to [overdose]," Boukamp responded that it was time for "drastic measures," which he explained meant "getting you here [as soon as possible]." M. explained that her parents now knew about Boukamp because they "went through [her] phone" after the suicide attempt, but she reassured Boukamp that, even though she was underage, "the feds aren't after you" and that her parents "aren't going to the police."

No. 22-11035

By late August, the tenor of the conversations between M. and Boukamp had changed. M. stated that she became more open to Boukamp's advances because she "just didn't care anymore, so [she] just started . . . accepting what was going to happen." She even told Boukamp that she was "in love with [him] in some twisted way." They began planning for Boukamp to come to Lubbock and take M. away with him, eventually deciding that Boukamp would pick M. up at her middle school on November 13, 2020. M. would be Boukamp's "sex slave" and "housewife," and he would get her pregnant.

The day before their planned meeting, M. was scheduled to have her braces removed. But, when her family's car broke down, she was unable to make the appointment. This made M. extremely upset. Nonetheless, the next morning—November 13, 2020—M. was "super-excited, extra happy, bubbly, and singing to herself." That afternoon, she walked out of her middle school and got into Boukamp's car, leaving behind a fictitious runaway note saying that she had gone to California for a better life. Boukamp removed the SIM card from M.'s phone to avoid being tracked, and the two began the drive back to his house in Michigan.

The first night together, Boukamp forced M. to give him oral sex in the car while parked behind a gas station. Once in Michigan, M. and Boukamp had vaginal sex multiple times a day. Boukamp also sexually penetrated M. with objects—including a turkey baster that had garlic and water inside, the ceramic handle of a knife, and a spoon—and strangled and hit her. M. described her sexual encounters with Boukamp as both loving and violent. During their time at the lake house, Boukamp used pliers to remove M.'s braces. M. had previously written to Boukamp about wanting to "rip them off" herself and that they would "have to take [the braces] off like [as soon as possible]" once they were together.

4

No. 22-11035

Law enforcement eventually tracked M. to Michigan. On November 22, 2020, FBI agents and Michigan State Police went to the lake house and ordered the occupants to come outside over a loudspeaker. Boukamp and M. complied, and Boukamp was taken into custody. A subsequent search found 32 images and 11 videos (worth 825 images) of child pornography on Boukamp's phone, including several images of children other than M.

## B.

Boukamp was indicted in the Northern District of Texas on sixteen criminal charges: one count of transporting a minor to engage in criminal sexual conduct, in violation of 18 U.S.C. § 2423(a) (Count One); one count of travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b) (Count Two); one count of enticement/attempted enticement of a minor, in violation of 18 U.S.C. § 2422(b) (Count Three); two counts of receipt of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b) (Counts Four and Six); one count of cyber stalking, in violation of 18 U.S.C. §§ 2261A(2) and (b)(4) (Count Five); and ten counts of production/attempted production of child pornography, in violation of 18 U.S.C. § 2251(a) (Counts Seven through Sixteen). His attorney, David Guinn, Jr., requested a competency hearing pursuant to 18 U.S.C. § 4241(a).

Guinn said that, in his thirty years of practice, he had "never had a client more difficult to communicate with rationally about the nature of the case, the reality of legal proceedings and law as well as the potential consequences or who was so unable to rationally evaluate his situation or make decisions." Guinn explained that, although Boukamp was clearly intelligent, he "had very fixed views and was unable to accept or process the views of others." Specifically, Guinn found that Boukamp was fixated on the idea that if he could just meet with the judge, M., M.'s father, and the prosecutor, the case would be dropped because he would be able to explain

how he and M. were soulmates, that they would get married, and that he would give her a better life.

Four mental-health professionals evaluated Boukamp, and each testified at the May 3, 2022 competency hearing. First, Natalie Montfort and Michelle Garcia—clinical psychologists who specialize in autism—evaluated Boukamp on three separate occasions in June and July 2021. Based on psychological testing, Montfort and Garcia diagnosed Boukamp with autism. They explained that Boukamp likely exhibited signs of autism from a young age but that, as is common in autistic children who succeed academically, the symptoms were written off as quirkiness. Montfort and Garcia expressed concern that Boukamp's autism—particularly his "rigid thinking style" and "trouble refocusing obsessive thoughts"—would interfere with his ability to "understand and engage thoughtfully in the legal process." For example, they noted that Boukamp "wants to go to trial to see [M.], not because it is the best option for his case." They therefore recommended that Boukamp be evaluated by a forensic psychologist.[2]

Lacie Biber—a forensic psychologist for the Federal Bureau of Prisons at the Federal Medical Center in Fort Worth, Texas—interviewed Boukamp in December 2021 and January 2022. Although she did not independently evaluate Boukamp for autism, she agreed with Montfort and Garcia's diagnosis, noting that Boukamp presented with characteristics of the disorder, "including rigid and inflexible thinking." However, Biber found that this rigidity "did not appear to permeate all areas of [Boukamp's] thinking" since he demonstrated at least "some ability to take feedback from his parents about how to proceed with his legal team." Biber also noted that

---

[2] Montfort and Garcia are clinical—not forensic—psychologists. Consequently, neither was formally trained to perform competency evaluations, nor had either previously given an opinion on a defendant's competency in court.

Boukamp was "aware of his charges," including the fact that if he went to trial and was convicted, he could be sentenced to life in federal prison; "possess[ed] adequate factual information related to Court proceedings," including the adversarial nature of the courtroom, a defendant's right not to testify, and the different roles of the prosecution, defense, judge, and jury; and understood the "different defense options a defendant could take based on evidence, as well as probability of potential outcomes." Biber specifically remarked that Boukamp possessed "knowledge of legal information beyond what is typically reported by defendants, including citing case law and procedural information." Based on these findings, Biber concluded that, notwithstanding the rigid and inflexible thinking caused by his autism, Boukamp was "able to understand the nature and consequences of the proceedings against him, and assist properly in his defense," and was therefore competent to stand trial.

Finally, Denise Kellaher—a forensic psychiatrist retained by Boukamp's family—interviewed Boukamp on March 14, 2022. While Kellaher agreed with Biber that Boukamp had "a sufficient *factual* understanding" as well as "some level of general rational understanding" of the courtroom and proceedings against him, she disagreed with Biber's conclusion that Boukamp was competent to stand trial. Specifically, Kellaher determined that Boukamp's "erotomanic delusion involving the victim and his [autism-]related rigidness" prevented him from possessing "a sufficient level of rational understanding of the proceedings." For example, Kellaher noted that "Boukamp believed he could get out of his current legal charges if granted a chance to talk to the victim before the trial started" because the two were "romantically committed to each other." She also found that Boukamp's "ability to consult with his attorneys with a reasonable degree of rational understanding" was "precariously contingent upon if and how the

attorneys will comply with how Mr. Boukamp wishes to conduct himself in the courtroom in the presence of the victim."

Given that both Biber and Kellaher agreed that Boukamp had the requisite *factual* understanding to stand trial, the trial court's competency determination hinged on whether Boukamp had sufficient *rational* understanding. In the district court's view, "a rational understanding requires . . . that a defendant is able to make considered choices based on the facts." But the court was careful to explain that "rational understanding does not mean that a defendant must choose the optimal strategy or decision that will benefit him in the proceedings; it does not mean that a defendant must be free from every misconception concerning his case or his chances at trial. Rather, it means that a defendant must be able to perceive the risks and benefits associated with the choices set before him and to make a considered decision based on the facts." The court held that Boukamp met this standard, notwithstanding his "fixed beliefs about [M.] or his chances at trial." And as for Boukamp's ability to work with counsel, the court found that the evidence showed only an occasional *unwillingness*—not any *inability*—to communicate and consult with his attorneys, and therefore had no impact on his competency to stand trial.

C.

The day after he was found competent to stand trial, Boukamp was arraigned. But before the arraignment could even begin, Boukamp informed the court that he had decided to represent himself. His arraignment therefore turned into a *Faretta* hearing. The court repeatedly warned Boukamp that representing himself would be "unwise" and "strongly urge[d]" Boukamp to reconsider. And Boukamp's counsel strenuously objected to the court permitting Boukamp to represent himself, arguing that, under the Supreme Court's decision in *Godinez v. Moran*, 590 U.S. 389 (1993), "a base finding of

competency . . . does not obviate the need to determine that [Boukamp's] waiver of [his right] to an attorney is intelligent," and that the court could not make such a determination without further consideration of Boukamp's "psychological records." The district court disagreed that any further consideration of Boukamp's mental faculties was required, found that Boukamp's waiver of his right to counsel was knowing and voluntary, and therefore permitted him to represent himself. On the government's motion, the court appointed the federal public defender as standby counsel. Boukamp then pled not guilty, and trial was set for June 6, 2022.

On May 5, 2022, the government sought to continue trial to July 11, 2022. The same day, the court granted the motion in part, continuing trial to June 14, 2022 "in light of the defendant's pro se status and the government's concerns about the defendant's access to discovery." On May 11, Boukamp filed his own motion "seeking a continuance until at least the government's most recently proposed date [of July 11, 2022], but preferably until later in July or early August." The court denied the motion.

## D.

Trial commenced on June 14, 2022 and lasted three days. Boukamp represented himself. The government's case culminated at the end of the second day, when M. took the witness stand. On cross-examination, Boukamp sought to establish that he and M. were in love, that M. had been a willing participant in planning their trip from Texas to Michigan, that M. made no attempt to escape or call for help while in Michigan despite numerous opportunities to do so, and that M. wanted Boukamp to remove her braces. Throughout Boukamp's cross-examination of M.—and, indeed, during most of Boukamp's cross-examinations—the court repeatedly sustained government objections and admonished Boukamp to move along to a new topic or question.

When the government rested, Boukamp was faced with the decision of whether to testify in his own defense. During the pretrial conference, the court had informed Boukamp that if he wished to testify, he would have to do so in question-and-answer format—that is, he "would have to ask [himself] a question and then give an answer." Boukamp said that he understood the court's rule. Then, on the morning of the third day of trial, before bringing in the jury, the court reminded Boukamp that he would need to testify in question-and-answer format if he chose to testify. Boukamp again told the court that he understood. But when it came time for him to make his decision, Boukamp complained to the court, in the presence of the jury, "I wish to testify, Your Honor, but I can't do it in question-and-answer format. . . . I think that would make me look schizophrenic." The court immediately attempted to cure the situation by speaking directly to the jury:

> So in pro se trials, criminal defendants have the right to testify, like all criminal defendants, whether, you know, they're representing themselves or they're represented by an attorney. They don't have to testify. No criminal defendant—they have a constitutional right to say nothing. If any of you are ever charged, you would have the same right. Everybody has it.
>
> You also have the right to testify if you want to. But it's the defendant's choice. Right? But—and I'm going to instruct you extensively on this later—I think I already have as well. You can draw no inference whatsoever whether he does or doesn't testify. It—literally, it can't come into your deliberations. If he chooses to, you can consider his testimony.
>
> When someone represents themselves, which this defendant does, as you've seen throughout this trial, he represents himself completely. Testifying when you're also representing yourself can be a bit awkward. Right? How do you ask yourself a question, and answer? As a judge, I have the option to require a pro se defendant to ask questions, even though they're asking it of himself or herself, and then answer. I have required that in

this case if he wants to testify, because it makes for a more orderly-paced, clear presentation of the evidence, as opposed to just a speech under oath.

So that's what I would require. He's not schizophrenic. Don't draw that conclusion. I am the one—If he chooses to testify, it's a format that I am requiring. Clearly, he doesn't want that format, but I think it makes for a better and cleaner trial. That's it. So draw no bad inference from this format if he wants to testify.

Boukamp elected not to testify, explaining that he felt the required question-and-answer format was "unworkable." Yet during closing argument, Boukamp repeatedly veered into offering testimony. Nonetheless, the court regularly overruled the government's objections, noting that the jury knew it was just closing argument, not evidence. But when Boukamp told the jury, "I wish I could take my brain and I could plug it in and you could see videos of us together through my perspective while we were together. You would see everything that I'm talking about . . . like going hiking and loving each other, and you would see her face, and you would hear the things that she said to me that made me want to give my life up for her and still make me love her to this day," the court decided he had gone too far astray. When the government again objected, the court said:

All right, Mr. Boukamp. I've given you a lot of leeway. Stick with—This is not a time for you to testify or try to testify. You chose not to. Stick with arguing the evidence in the case and inferences from it. The jury knows that this is just closing argument. Go ahead.

Once closing arguments concluded, the court instructed the jury. As relevant here, the instructions for Count One—transporting a minor to engage in criminal sexual conduct, in violation of 18 U.S.C. § 2423(a)—stated:

11

The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

1. The Defendant knowingly transported [M.] in interstate or foreign commerce;

2. At the time of transportation, [M.] was less than 18 years old; and

3. At the time of the transportation, Defendant intended that [M.] would engage in unlawful sexual activity.

And the instructions for Count Two—travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b)—listed the second element of the offense as "The Defendant traveled for the purpose of engaging in illicit sexual conduct" and explained:

The Government does not have to show that the Defendant's only purpose in traveling in interstate commerce was to engage in illicit sexual conduct, but the Government must show that it was one of the motives or purposes for the travel. In other words, the Government must show that the Defendant's criminal purpose was not merely incidental to the travel.

The jury deliberated for just over an hour before convicting Boukamp on all sixteen counts.

### E.

For sentencing, Boukamp requested, and was appointed, counsel. His total offense level was literally off-the-charts—it was initially calculated as 50 and then increased to 52 after it was revealed that Boukamp had written to his brother seeking assistance in escaping from jail, but the Sentencing Guidelines' Sentencing Table only goes up to an offense level of 43. Thus, despite Boukamp having a Criminal History Category of I—the lowest category—the Guidelines called for a sentence of lifetime imprisonment.

No. 22-11035

At the sentencing hearing, three character witnesses—Boukamp's father, brother, and sister—spoke on Boukamp's behalf. After they finished, Boukamp's attorney asked the court to impose a 30-year sentence followed by a lifetime of supervised release, arguing that Boukamp's lack of criminal history, his youth at the time of his offense, and his autism—which caused his mental and emotional age to be even less than his biological age—militated in favor of granting Boukamp "an opportunity for redemption."

The court acknowledged that Boukamp's "autism can explain some things" but categorically rejected "any insinuation that Autism Spectrum Disorder was a direct cause of [Boukamp] bullying, raping, taking the victim from Lubbock or indulging in child pornography," characterizing such an argument as "incredibly offensive to the autism community." The court found that "the seriousness . . . and the harm of [Boukamp's crimes were] hard to overstate," noting that his offenses were "incredibly violent," "manipulative," and "premeditated." And while Boukamp's family support and lack of criminal history "weigh[ed] in [Boukamp's] favor," the court was particularly troubled by evidence that Boukamp's relationship with M. was not just a "one-off" thing, but rather Boukamp had "a demonstrated continued pattern of a sexual interest in children" and a willingness to "act on it." Indeed, during his statement to the judge at the sentencing hearing, Boukamp reiterated that he still "love[s] [M.]" and is "never going to stop" even though "[e]veryone tells me it's wrong, it's terrible." Because, in the court's view, there was "no sign of potential acceptance [of wrongdoing or] rehabilitation," the court found that Boukamp posed "a very, very significant" risk of harm to the public if he were ever released. Boukamp was therefore sentenced to life in prison.

II.

Boukamp, through counsel, raises nine issues on appeal: (1) whether the district court erred in finding Boukamp competent to stand trial, (2) whether the district court made constitutionally impermissible remarks regarding Boukamp's decision not to testify in his own defense, (3) whether Boukamp's life sentence was substantively unreasonable, (4) whether the district court provided erroneous jury instructions on Counts One and Two of the indictment, (5) whether the district court impermissibly limited Boukamp's ability to cross-examine witnesses, (6) whether the district court erred by denying Boukamp's motion to continue the trial, (7) whether the cumulative-error doctrine warrants reversal, (8) whether the district court erred by requiring Boukamp to testify in a question-and-answer format if he decided to testify on his own behalf, and (9) whether the district court erred in permitting Boukamp to represent himself at trial. We will address each in turn.

A.

We begin with the question of whether Boukamp was competent to stand trial. We review *de novo* whether the district court applied the correct legal standard in assessing Boukamp's competency. *Panetti v. Stephens*, 727 F.3d 398, 409 (5th Cir. 2013). Because a competency determination is a "mixed question of fact and law," we "re-analyze the facts and take a hard look at the trial judge's ultimate conclusion" but only reverse if the conclusion is "clearly arbitrary or unwarranted—a species of clear error review." *United States v. Doke*, 171 F.3d 240, 247 (5th Cir. 1999) (quotation marks and citation omitted). A defendant is competent to stand trial if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual

understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960).

### 1.

The parties agree that Boukamp possessed sufficient factual understanding of the proceedings. So, the dispositive issue with respect to competency—both for the district court and on appeal—is whether Boukamp had "a reasonable degree of rational understanding." *See id.*

Boukamp argues that "a defendant must be able to make rational decisions to meet the 'rational understanding' prong of the competency standard." The government accuses Boukamp of attempting to import "some 'decisional competence' overlay above and beyond the *Dusky* standard" but argues that, in any event, such a standard was satisfied because "the district court *did* consider Boukamp's ability to make 'considered choices' as part of its analysis."

The closest the Supreme Court has come to a clear statement on this issue was its opinion in *Godinez v. Moran*, 509 U.S. 389 (1993). There, the Court resolved a debate among the lower courts about "[w]hether the competency standard for pleading guilty or waiving the right to counsel is higher than the competency standard for standing trial." *Id.* at 395. The Ninth Circuit had applied the standard that a defendant who seeks to plead guilty or waive counsel was required to demonstrate "the capacity for 'reasoned choice' among the alternatives available to him." *Id.* at 397. But the Supreme Court saw little—if any—daylight between the Ninth Circuit's "reasoned choice" standard and *Dusky*'s "rational understanding" standard, instead viewing the "difference between the two standards" as "merely one of terminology." *Id.* (quotation marks omitted). Thus, in holding that the *Dusky* standard applied uniformly to all competency determinations, the Supreme Court appeared to read a decision-making gloss

into the standard for *Dusky* rationality. *See id.* at 403 (Kennedy, J., concurring) ("What is at issue here is whether the defendant has sufficient competence to take part in a criminal proceeding and to make the decisions throughout its course.").

The district court evaluated Boukamp's competency under the standard that "a rational understanding requires . . . that a defendant is able to make considered choices based on the facts" of his case. Boukamp contends that the district court's "'considered choice' test is distinct from the Supreme Court's 'rational' choice analysis" and was therefore legal error. We disagree. If the Supreme Court found no difference between "reasoned choice" and "rational understanding" in *Godinez*, we see no basis for finding a difference between "considered choice" and "rational choice" here. Indeed, "rational," "reasoned," and "considered" are synonyms. *See Considered*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/considered (last visited June 21, 2024) (listing "reasoned" as a synonym); *Reasoned*, Merriam-Webster Thesaurus, https://www.merriam-webster.com/thesaurus/reasoned (last visited June 21, 2024) (listing "rational" as a synonym).

The more difficult question is what it means for a choice to be "rational" or "considered" in this context. Boukamp argues that the ability to make a "rational" or "considered" choice means the ability to make a "favorable" choice. The government disagrees, contending that any "claim that a defendant's rational understanding . . . necessarily means the ability to make wise or 'favorable' decisions cannot be right." But these arguments beg a critical question—"favorable" in *whose* eyes?

Boukamp's position—that he was incompetent because he was hyper-focused on proceeding to trial and therefore could not even entertain accepting a plea deal—proceeds based on the flawed assumption that what is

No. 22-11035

"favorable" is what an objective individual would consider prudent. Our precedent makes clear that, to the extent Boukamp is correct that a rational choice means a favorable choice, favorability is in the eye of the defendant.

*Rumbaugh v. Procunier*, 753 F.2d 395 (5th Cir. 1985), presents a particularly extreme example. There, the defendant, Rumbaugh, had been convicted of capital murder and sentenced to death. *Id.* at 396. He instructed his counsel "to take no further steps to attack his conviction and sentence" and "refused to authorize anyone to file a petition for writ of certiorari or to seek a stay of execution." *Id.* at 396–97. At the hearing to determine whether Rumbaugh was competent to make these decisions, he "pulled a homemade knife-like weapon from his pocket and advanced on the deputy U.S. Marshal, shouting 'Shoot!' The Marshal was forced to shoot Rumbaugh," who survived "[a]fter life-saving measures were taken," over Rumbaugh's objection. *Id.* at 397. The district court nonetheless concluded that "Rumbaugh was mentally competent to make the decision to forgo further judicial proceedings." *Id.* at 397. On appeal, we affirmed, finding that although Rumbaugh suffered from "severe depression," he was still "able to feed relevant facts into a rational decision-making process and come to a reasoned decision." *Id.* at 402–03. Although that "reasoned decision" was to forgo a potentially meritorious appeal and accept death—a decision that, the panel noted, was "one that we would disagree with"—it was nonetheless "the product of a reasonable assessment of the legal and medical facts and a reasoned thought process." *Id.* at 402.[3]

---

[3] Because *Rumbaugh* concerned competency to waive appeals rather than competency to stand trial, the case was evaluated under the standard from *Rees v. Peyton*, 384 U.S. 312, 314 (1966): whether the defendant had the "capacity to . . . make a rational choice with respect to continuing or abandoning further litigation." But after *Godinez*, there is likely little, if any, difference between the *Rees* and *Dusky* standards. *See Godinez*, 509 U.S. at 397.

And *Rumbaugh* is not some historical anachronism. In 2004, for example, we decided *Roberts v. Dretke*, a case where a capital-murder defendant "instructed his trial counsel . . . to steer the trial towards the imposition of the death penalty" and therefore "waived voir dire, chose jury members who favored the death penalty, did not interview family members before trial, called no witnesses during the guilt/innocence phase of the trial, called no witnesses during the punishment phase, did not request a jury instruction on parole laws, and made no argument in favor of a life sentence." 381 F.3d 491, 494–95 (5th Cir. 2004). We found no due process violation in the trial court's failure to hold a competency hearing, explaining that the lower court was not required to "doubt a capital punishment defendant's competency, or conclude that such defendant does not understand the proceedings against him or appreciate their significance, or conclude that he cannot rationally aid his attorney in his defense simply because it is obvious to the court that the defendant is causing his trial to be conducted in a manner most likely to result in a conviction and the imposition of the death penalty." *Id.* at 498. We reiterated this conclusion in *Austin v. Davis*, holding that the defendant had sufficient "ability to make strategic choices" despite "evidence of mental illness" and the fact that he decided "to waive counsel and plead guilty to capital murder." 876 F.3d 757, 780 (5th Cir. 2017).

This line of cases shows that a criminal defendant has the ability to make a rational or considered choice only if he can make a decision that is "favorable"—but "favorable" means in furtherance of the *defendant's* preferred ends. The district court properly adhered to this standard. As the trial court's competency decision correctly explained:

> Rational understanding does not mean that a defendant must choose the optimal strategy or decision that will benefit him in the proceedings; it does not mean that a defendant must be free from every misconception concerning his case or his chances

> at trial. Rather, it means that a defendant must be able to perceive the risks and benefits associated with the choices set before him and to make a considered decision based on the facts.

Or, in other words, the defendant must be "able to feed relevant facts into a rational decision-making process and come to a reasoned decision," even if that decision is one that an objective observer would vehemently disagree with. *Rumbaugh*, 753 F.2d at 402.

2.

Having determined the applicable standard, we turn to the question of whether, when applying this standard to the facts of Boukamp's case, the district court's conclusion that Boukamp was competent was "clearly arbitrary or unwarranted." *Doke*, 171 F.3d at 247. We conclude that it was not.

a.

Two threshold issues warrant discussion. The first is Boukamp's assertion that the district court "disregard[ed] how autism affects Mr. Boukamp's competency." This is simply not true. Boukamp's autism was the primary focus of the competency hearing. And in its written opinion, the court fully recognized that Boukamp's autism caused him to have "fixed beliefs about [M.] or his chances at trial" and factored that into its analysis.

Second, it is important to recognize that Boukamp's "fixed beliefs" were based on record evidence. Boukamp believed that, if he went to trial, M. would testify that she and Boukamp were in love, that she was a willing participant in running away with him to Michigan, and that the vile communications and acts that constituted the core of the government's case were expressions of this love rather than evidence of abuse and manipulation. And, as even Boukamp's appellate counsel concedes, "there is ample

19

evidence [in the record] to support Mr. Boukamp's view." M. repeatedly told Boukamp that she loved him. She assisted Boukamp in planning their rendezvous, going so far as to send Boukamp a Google Images photo of the road on which he could pick her up to avoid detection. And M. had met Boukamp in an Omegle chatroom for those with an interest in "death" and had expressed to Boukamp that she "lov[ed] being manipulated and then raped and then constantly abused," would "let [Boukamp] rape" her, and wanted him to "give [M.] a little choke" or "choke [her] out." These facts could have led Boukamp to believe—or at least hope—that M. would testify to the same at trial.

This evidence also could have led Boukamp to believe that, if M. testified as he predicted she would, the jury could have acquitted him. For example, if Boukamp was able to show that he did not need to persuade, induce, entice, or coerce M. to engage in sexual activity, then he could have been acquitted on the enticement charge. And if he was able to show that he did not intend to injure, harass, or intimidate M. through his online communications, then Boukamp could have been acquitted on the cyber stalking charge.

As for the remaining counts, the evidence could have led Boukamp to believe that he could curry sympathy from the jury by convincing them that he acted out of love rather than malice. At least one of our sister circuits has held that a *pro se* defendant pursuing such a strategy is a sign of competency, not incompetency. *See United States v. DiMartino*, 949 F.3d 67, 72 (2d Cir. 2020).

For this reason, Boukamp's attempt to analogize his situation to one in which a defendant "goes to trial based on his fixed belief that the President of the United States will personally defend him" falls short. So too does his reliance on cases like *Lafferty v. Cook*, where the defendants were found

incompetent due to their delusional belief that "the state was without jurisdiction to try them because God directed their action"—*i.e.*, God had instructed them to murder their sister-in-law and her infant daughter. 949 F.2d 1546, 1548, 1552, 1556 (10th Cir. 1991). As the *Lafferty* court explained, "a sufficient contact with reality" is "the touchstone for ascertaining the existence of a rational understanding." *Id.* at 1551. And a defendant who believes that the President of the United States will personally defend him or that he could not be tried for murder because he was a messenger of God lacks such contact. While in many cases, it may be difficult to draw the line on precisely *when* a defendant loses "sufficient contact with reality" to stand trial, this is not one of them.

b.

With those threshold issues resolved, the question of whether Boukamp was "able to feed relevant facts into a rational decision-making process and come to a reasoned decision" about whether to plead guilty or go to trial is fairly straightforward. *See Rumbaugh*, 753 F.2d at 402–03. As the district court explained, Boukamp understood that he was facing federal felony charges, that the government bore the burden of proof, that he had the right to trial by jury, that he had the opportunity to accept a plea bargain of 30 years' imprisonment, that he could be sentenced to life in prison if he went to trial and was convicted, and that the government had a very strong case against him. He considered these facts alongside his belief that M. would testify in his favor and his view that a 30-year sentence "would still be like life in prison" and decided that proceeding to trial was worth the risk. Boukamp's counsel may not agree with the decision—indeed, most objective observers would likely conclude that it was foolish—but the district court was correct that, so long as Boukamp was able to "perceive[] the risks and benefits of the choices set before him and . . . make a considered decision based on the facts"—which he was—the decision of whether to plead guilty

or go to trial was "his alone to make." *See id.* at 402 ("We find [the defendant's] decision to be the product of a reasonable assessment of the legal and medical facts and a reasoned thought process, albeit one that we would disagree with.").

For similar reasons, the district court did not clearly err in concluding that Boukamp had the ability "to consult with his lawyer with a reasonable degree of rational understanding." *See Dusky*, 362 U.S. at 402. The district court concluded that Boukamp was entirely able—just sometimes *unwilling*—to consult with his attorneys and that such unwillingness did not render him incompetent. We agree. As the district court explained, Boukamp's expert forensic psychiatrist reported that Boukamp's ability to consult with his attorneys was "contingent upon if and how the attorneys will comply with how Mr. Boukamp wishes to conduct himself in the courtroom." In other words, even Boukamp's own expert agreed that he was *able* to consult with his attorneys, just *unwilling* to do so when he disagreed with their advice. But intransigence is not incompetence. *See, e.g.*, *United States v. Vachon*, 869 F.2d 653, 655 (1st Cir. 1989) (affirming finding of competence based on district court's determination that defendant "was *unwilling* to assist" in his defense but "not . . . '*unable*' to do so"); *United States v. Guerrero*, 279 F. App'x 29, 30 (2d Cir. 2008) (affirming finding of competence based on district court's determination that defendant was "able, although apparently not willing, properly, to assist in his defense"). And to the extent Boukamp disagrees with the district court's view of the expert evidence, it is simply "not our task, as an appellate court, to relitigate the battle of the experts" on this issue. *United States v. Simpson*, 645 F.3d 300, 306 (5th Cir. 2011).

No. 22-11035

\* \* \*

To sum up, the district court applied the proper legal standards during Boukamp's competency hearing, and the court's conclusion that Boukamp had sufficient factual and rational understanding to stand trial was not clearly arbitrary or unwarranted.

B.

We now turn to Boukamp's second alleged error—the district court's comments on Boukamp's decision not to testify in his own defense. The Fifth Amendment forbids a judge from calling the jury's attention to the defendant's silence. *Davis v. United States*, 357 F.2d 438, 441 (5th Cir. 1966) (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)). Boukamp argues that the district court made two constitutionally impermissible remarks on his silence: first, when the court directly addressed the jury after Boukamp expressed that he wanted to testify but was not comfortable doing so in the court's required format; and second, when the court admonished Boukamp during his closing argument that "This is not a time for you to testify or try to testify. You chose not to." Because Boukamp did not object at trial, we review these comments only for plain error. *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009) (citing *United States v. Holmes*, 406 F.3d 337, 356 (5th Cir. 2005)).

We review Boukamp's Fifth Amendment claim in two steps. First, we must determine whether the judge made a constitutionally impermissible comment on Boukamp's decision not to testify. *United States v. Murra*, 879 F.3d 669, 682–83 (5th Cir. 2018). Under plain-error review, the impermissible nature of the remark must be "clear or obvious, rather than subject to reasonable dispute." *See Puckett v. United States*, 556 U.S. 129, 135 (2009); *Vargas*, 580 F.3d at 279. Second, upon a finding of a clear or obvious impermissible remark, we "must decide whether the remark casts serious

23

doubt on the correctness of the jury's verdict" in light of "(1) the magnitude of the prejudicial effect of the [impermissible] remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Murra*, 879 F.3d at 684 (alteration adopted) (quotation marks and citation omitted). And even if both prongs are satisfied, we have "the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Puckett*, 556 U.S. at 135 (alteration adopted) (quotation marks and citation omitted).

For a remark to be constitutionally impermissible, it must be clear or obvious that either (1) the judge's "manifest intent was to comment on the defendant's silence" or (2) "the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *Murra*, 879 F.3d at 682–83. This determination is made when considering the remark in context, not in isolation. *United States v. Lara*, 23 F.4th 459, 479 (5th Cir. 2022).

In context, it is not clear or obvious that the judge intended for either of the remarks at issue to be a comment on Boukamp's silence, nor is it clear or obvious that the jury would necessarily construe them as such. If anything, it borders on clear and obvious that these were *not* comments on Boukamp's silence.

Beginning first with the judge's comment to the jury when Boukamp was considering whether to testify, it is critical to recognize that the district court had repeatedly given Boukamp advance notice that, if he decided to testify, he would be required to do so in question-and-answer format. First, in the pretrial conference, the court informed Boukamp that, if he testified, he "would have to ask [himself] a question and then give an answer," to which Boukamp responded that he understood. Then, on the morning of the

third day of trial, before bringing in the jury, the court reminded Boukamp that he would need to testify in question-and-answer format, and Boukamp told the court that he had no questions about that process. But later that day, and in the presence of the jury, Boukamp expressed concern that testifying in question-and-answer format "would make [him] look schizophrenic." The court immediately responded, "I'll instruct the jury," and proceeded to tell the jury that Boukamp was not required to testify, that they could draw no inference whatsoever from his decision whether or not to testify, and that if he *did* decide to testify, the question-and-answer format of his testimony was required by the court and not any indication that Boukamp was schizophrenic. The manifest intent of this statement was to assuage Boukamp's concern that the jury would think he was schizophrenic if he testified in question-and-answer format while ensuring that the jury would not draw any inference if Boukamp decided *not* to testify. And the jury would have likely interpreted the judge's statement in the same way—as a clarification concerning the format in which Boukamp would be required to testify and a reminder not to factor Boukamp's decision about whether to testify into their deliberations. Indeed, when coupled with Boukamp's response to the judge that he was not going to testify because he found the question-and-answer format "unworkable," the most logical takeaway for the jury would have been that Boukamp was not testifying because of the format, not because he was guilty.

As for the judge's comment to Boukamp during closing argument, it came after the court had repeatedly given Boukamp leeway when his argument crossed into impermissible testimony. It was only when Boukamp gave the jury a soliloquy about what they would see if they were in his brain that the judge stepped in to remind Boukamp, "This is not a time for you to testify or try to testify. You chose not to. Stick with arguing the evidence in the case and inferences from it. The jury knows that this is just closing

argument." The context shows that the intent of the judge's comment was to keep Boukamp's closing argument on the rails—*i.e.*, arguing the evidence in the case. It was not intended to draw attention to the fact that Boukamp did not testify in his own defense. And again, the jury would have understood that the judge's comment was designed to help them distinguish argument from evidence, not to call attention to the fact that Boukamp did not testify. There was simply no plain error in the court's decision to "place [Boukamp's closing] argument in perspective by noting that its substance was not to be taken as evidence." *See United States v. LaChance*, 817 F.2d 1491, 1497 (11th Cir. 1987) (finding no error in judge's comment to the jury that the *pro se* defendant "had an opportunity to testify under oath where he could have been cross-examined by the prosecution. He chose not to do that, and therefore, anything he says is not evidence in the case").

In any event, even if these comments were constitutionally impermissible, they do not "cast[] serious doubt" on the jury's verdict. *See Murra*, 879 F.3d at 684. Among other evidence, the jury heard directly from M. that she was coerced, manipulated, and abused by Boukamp. They saw hundreds of pages of chat logs between Boukamp and M. that directly corroborated M.'s testimony. They listened to the sexual assault nurse examiner describe her discussions with and examination of M. in detail. And they saw pictures of child pornography that were found on Boukamp's phone. Put simply, the evidence against Boukamp was overwhelming. The jury had no need to draw any inferences from Boukamp's silence to convict him—everything they needed was right there in black-and-white.

## C.

Next, we address Boukamp's sentence. The district court sentenced Boukamp to life on Count One, 360 months on Count Two, life on Count Three, 240 months on Count 4, 180 months on Count Five, 240 months on

No. 22-11035

Count Six, and 360 months each for Counts Seven through Sixteen to be served concurrently for a total term of imprisonment for life. We review the substantive reasonableness of Boukamp's sentence under a highly deferential abuse-of-discretion standard. *United States v. Khan*, 997 F.3d 242, 247 (5th Cir. 2021) (citing *Gall v. United States*, 552 U.S. 38, 41 (2007)). And where, as here, a sentence conforms to the Guidelines advisory range, it is "presumptively reasonable." *United States v. Campos-Maldonado*, 531 F.3d 337, 338 (5th Cir. 2008); *see also Rita v. United States*, 551 U.S. 338, 347 (2007) (holding that an appellate court may apply a presumption of reasonableness to a within-guidelines sentence). "The presumption is rebutted only upon a showing that the sentence does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors." *United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009).

Boukamp argues that the district court clearly erred in balancing the 18 U.S.C. § 3553(a) sentencing factors in three ways. We address each in turn.

1.

First, Boukamp contends that the court "failed to account for the history and characteristics of Mr. Boukamp and the nature and circumstances of the offense," as required by § 3553(a)(1), because it "outright rejected" any contention that Boukamp's autism should be considered as part of the analysis. But the district court *did* consider Boukamp's autism when evaluating this sentencing factor, acknowledging that Boukamp's "autism can explain some things" about Boukamp's conduct. What the judge "outright rejected" was "any insinuation that [Boukamp's autism] was a direct cause of [him] bullying, raping, taking the victim from Lubbock or

indulging in child pornography," characterizing such an argument as "incredibly offensive to the autism community." This is not the same as refusing to consider the fact that Boukamp was autistic at all.

Take, for example, the Sixth Circuit's decision in *United States v. Lucarell*, No. 22-3732, 2023 WL 3756191 (6th Cir. June 1, 2023). There, the defendant challenged his sentence after pleading guilty to child-sex-related offenses, arguing that the district court "failed to consider his autism diagnosis." *Id.* at *2. But as the court of appeals explained, the record demonstrated that the district court *did* consider the defendant's autism, and there was no abuse of discretion in the district court's determination that, because there is "nothing specific about autism that causes people to commit crimes," the defendant's autism did not mitigate the disturbing nature and circumstances of his offenses. *Id.* The same is true here.

2.

Boukamp's second asserted error is that the district court improperly discounted Boukamp's potential for rehabilitation in assessing the risk that he posed to society, as required under § 3553(a)(2)(C). In support of this argument, Boukamp points to the Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551 (2005), and its progeny. Those cases set forth three categorical rules for sentencing juvenile offenders: (1) they cannot be sentenced to death, *id.* at 578; (2) they cannot be sentenced to life without parole for nonhomicide offenses, *Graham v. Florida*, 560 U.S. 48, 82 (2010); and (3) they cannot be subject to a *mandatory* sentence of life without parole for homicide, *Miller v. Alabama*, 567 U.S. 460, 465 (2012). But Boukamp was an adult—not a juvenile—when he committed his crimes. And while Boukamp argues that, due to his autism, many of his abilities—particularly those concerning social interactions—are equivalent to someone seven years old or less, we and our sister circuits have consistently rejected attempts to

apply the *Roper/Graham/Miller* categorical rules to adults whose "mental age" is that of a juvenile. *See, e.g.*, *United States v. Bernard*, 762 F.3d 467, 482–83 (5th Cir. 2014); *In re Garner*, 612 F.3d 533, 535 (6th Cir. 2010).

True, *Roper* itself acknowledged that drawing a categorical line at 18-years-old, although necessary, was in many cases arbitrary, since "[t]he qualities that distinguish juveniles from adults do not [automatically] disappear when an individual turns 18." 543 U.S. at 574. Indeed, the crux of these cases is that "youth matters" for purposes of sentencing, not because of youth *per se*, but rather due to the "heightened capacity for change" that accompanies youth. *Miller*, 567 U.S. at 473, 479, 483. And as Boukamp points out in his brief, record evidence showed that "individuals with autism like Mr. Boukamp *can* improve, particularly when it comes to sexual misconduct." Namely, Drs. Montfort and Garcia's expert report explained that there are "proven methods" through which individuals with autism can "develop[] . . . appropriate social and sexual behaviors" over time.

However, the district court was never asked to consider this evidence as part of its sentencing decision because Boukamp never raised it. While Boukamp's sentencing memorandum focused extensively on his autism, it did so only insofar as it related to his "history and characteristics" and the "nature and circumstances" of his crimes, *i.e.*, the § 3553(a)(1) sentencing factor—an argument that, as explained above, the district court rejected. The same was true at the sentencing hearing, where Boukamp's counsel asked the court to "take into consideration [Boukamp]'s age when he committed [his] offense" including the fact that his "mental and emotional age [was] even less than his 20 years of age," but again only insofar as it explained why he had a sexual interest in a 13-year-old. The district judge was under no obligation to scour the record "to raise every conceivably relevant issue on his own initiative." *Gall*, 552 U.S. at 54. And as for the arguments that

Boukamp *did* raise with respect to his age and autism, the district court addressed them head-on in its sentencing determination:

> I've had cases where a 19-year-old happens to meet somebody [underage] at a family function, soccer game or whatever and . . . it was wrong and the guy apologizes, but it was an organic one-off relationship. That is not this case. That is not close to this case. You have a demonstrated continued pattern of a sexual interest in children and you act on it.

The bottom line is that, during the sentencing proceedings, Boukamp failed to raise the *Roper* line of cases, Drs. Montfort and Garcia's expert report, or any suggestion that autistic individuals have a particular likelihood for rehabilitation when it comes to sexual misconduct. And Boukamp has not convinced us that the district court committed plain error in failing to do so of its own accord. *See United States v. Fraga*, 704 F.3d 432, 441 (5th Cir. 2013) (holding that arguments not raised at sentencing are "subject only to plain error review").

3.

Third, Boukamp argues that his life sentence should be reversed because it "is wildly out of step with that of other federal defendants." But § 3553(a)(6)'s requirement that the district court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" "is not a factor that we grant significant weight where the sentence is within the Guidelines range." *United States v. Diaz*, 637 F.3d 592, 604 (5th Cir. 2011).

Boukamp presents two bases upon which to find a sentencing disparity here: (1) national sentencing averages, and (2) the sentence handed down by the same district judge in *United States v. Morales-Jose*, No. 5:22-CR-17 (N.D. Tex.). Neither is compelling.

As we explained in *United States v. Willingham*, national sentencing averages "disregard individual circumstances and only reflect a broad grouping of sentences imposed on a broad grouping of criminal defendants; consequently, they are basically meaningless in considering whether a disparity with respect to a particular defendant is warranted or unwarranted." 497 F.3d 541, 544–45 (5th Cir. 2007). Accordingly, Boukamp's "arguments based on broad nationwide statistics are irrelevant" to our determination of whether any sentencing disparity here was unwarranted. *United States v. Naidoo*, 995 F.3d 367, 383 (5th Cir. 2021).

As for the sentence in *Morales-Jose*, the facts of that case show that the defendant there was not "similarly situated" to Boukamp, as necessary for that case to warrant consideration. *See United States v. Cedillo-Narvaez*, 761 F.3d 397, 406 (5th Cir. 2014). The defendant in *Morales-Jose* pled guilty to one count of transportation of a minor with intent to engage in criminal sexual conduct, in violation of 18 U.S.C. § 2423(a), and was sentenced to 120 months in prison. While Boukamp was sentenced to life for the same crime, that is where the similarities end. As an initial matter, the plea agreement in *Morales-Jose* stipulated to a term of imprisonment of 120 months, which became binding on the court upon the court's acceptance of the plea agreement. *See* Fed. R. Crim. P. 11(c)(1)(C). The defendant in *Morales-Jose* also faced a Guidelines range of 151 to 188 months whereas Boukamp's Guidelines range on this count was life. And while the defendant in *Morales-Jose* was a 24-year-old who had a sexual relationship with a 14-year-old—a larger age difference than between 19-year-old Boukamp and 13-year-old M.—there was no indication of coercion or that he engaged in the same sort of heinous and depraved sexual conduct as Boukamp—*e.g.*, penetrating M.'s vagina with the ceramic handle of a knife and a turkey baster containing garlic and water, strangling her, and hitting her.

No. 22-11035

D.

Next, we consider Boukamp's argument that we should vacate his convictions on Counts One and Two because the district court provided erroneous jury instructions on these counts. Boukamp also claims that the language of the indictment for Count Two was erroneous. We agree that the jury instructions for both counts, as well as the indictment for Count Two, were erroneous, but conclude that the errors did not affect the jury's verdict.

1.

The jury instructions for Count One—transporting a minor to engage in criminal sexual conduct, in violation of 18 U.S.C. § 2423(a)—stated, in relevant part, that, to convict Boukamp, the jury had to find that three facts had been proven beyond a reasonable doubt:

1. [Boukamp] knowingly transported [M.] in interstate or foreign commerce;

2. At the time of transportation, [M.] was less than 18 years old; and

3. At the time of the transportation, [Boukamp] intended that [M.] would engage in unlawful sexual activity.

Because he did not object to this instruction below, Boukamp must demonstrate that this instruction was a plain error that affected his substantial rights and that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Vasquez*, 677 F.3d 685, 692–93 (5th Cir. 2012).

Boukamp's argument that this jury charge was plainly erroneous centers on the Supreme Court's decision in *Mortensen v. United States*, which held that an intent to engage in unlawful sexual activity "must be found to exist before the conclusion of the interstate journey *and must be the dominant motive of such interstate movement*." 322 U.S. 369, 374 (1944) (emphasis

32

added). Because "the district court's instruction only required a finding of illicit sexual intent but never asked the jury to weigh Mr. Boukamp's motive for travel," Boukamp claims that the charge was clearly and obviously erroneous.

In response, the government points out that the Fifth Circuit has interpreted the phrase "dominant motive" "narrowly," such that a defendant can be convicted under Section 2423 so long as illicit sexual contact was "one of the efficient and compelling purposes" of travel. *United States v. Campbell*, 49 F.3d 1079, 1082 (5th Cir. 1995). This is undoubtedly true, and Boukamp concedes as much. But even under our narrow construction of *Mortensen*, this court requires proof not only of intent to engage in unlawful sexual activity, but also that this intent was one of the defendant's motives for traveling. Because the district court's instructions here allowed the jury to convict Boukamp based solely on an intent to engage in illicit sex with M. without any consideration of whether this intent was a *motive* for Boukamp's interstate travel, the instructions were plainly erroneous.

However, our finding that the jury instructions on Count One were plainly erroneous does not end the inquiry. We may vacate the conviction only if the erroneous jury charge affected Boukamp's "substantial rights" and "the fairness, integrity, or public reputation of judicial proceedings." *Vasquez*, 677 F.3d at 693. To show that the error affected his substantial rights, Boukamp bears the burden to "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different," *i.e.*, he would have been acquitted on Count One. *United States v. Staggers*, 961 F.3d 745, 755 (5th Cir. 2020) (internal quotation marks and citation omitted). Boukamp cannot make such a showing here.

Although the jury was not instructed to look for it, the evidence that Boukamp's travel with M. from Texas to Michigan was motivated by his intent to engage in sexual conduct with her is clear. In the days leading up to their interstate trip, Boukamp and M. talked constantly about sex. On November 5, 2020, M. told Boukamp that she had not masturbated "in a long time" because she was "saving up" so that she'd be "super horny" when she saw him. She also told Boukamp that she was a virgin and wanted Boukamp to "take [her] innocence away." On November 7, she told Boukamp, "[yo]u won't [have sex with] me on Friday though, more like Saturday or Sunday," and also discussed giving Boukamp oral sex. "Friday" was November 13—the day Boukamp was scheduled to pick M. up from school. M. also testified at trial that, prior to traveling to Texas, Boukamp told M. that he wanted to make her his "sex slave" and get her pregnant. As the government persuasively argues, if having sexual contact with M. was not a motivating purpose of Boukamp transporting M. from Texas to Michigan, it is strange that he made her give him oral sex their very first night together and engaged in sexual intercourse with her multiple times a day every day thereafter.

In light of the extensive evidence to the contrary, Boukamp's argument that his "one motive" for the trip was "so [he and M.] could be together, free of M.'s unfortunate circumstances," defies credulity. To be sure, record evidence shows that M.'s home life was dysfunctional and suggests that Boukamp believed that, by taking her away from home, he was protecting and saving her. But record evidence is just as clear that saving M. was not Boukamp's only motive—sex was a core motivation as well. Therefore, the jury had grounds to convict. *See, e.g.*, *Campbell*, 49 F.3d at 1083 ("[M]any purposes for traveling may exist, but, as long as one motivating purpose is to engage in [illegal sexual conduct], criminal liability may be imposed.").

No. 22-11035

Put simply, "there is not a reasonable probability that the jury would have returned a different verdict as to [Count One] if it had been properly instructed." *Staggers*, 961 F.3d 745, 756 (5th Cir. 2020). The error therefore did not affect Boukamp's substantial rights and provides no basis to vacate his conviction.

2.

As for Count Two—travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b)—the parties agree that both the indictment and jury instructions reflected outdated statutory language for this charge. Specifically, the indictment charged that Boukamp "did knowingly travel in interstate commerce *for the purpose of* engaging in any illicit sexual conduct," and the jury instructions stated that an element of the offense was that Boukamp "traveled *for the purpose of* engaging in illicit sexual conduct." But Congress amended § 2423(b) in 2018 to change "for the purpose of engaging" in illicit sexual conduct to "with a motivating purpose of engaging." Abolish Human Trafficking Act of 2017, Pub. L. No. 115-392, § 14, 132 Stat. 5250, 5256 (Dec. 21, 2018). So, as with Count One, there was a plain error in the indictment and jury instructions for Count Two, and the dispositive question is whether this error affected Boukamp's substantial rights.[4]

As with Count One, Boukamp cannot show a reasonable probability that, but for the errors in the indictment and jury instructions, he would not

---

[4] Boukamp contends that he preserved his objection to the jury instructions for Count Two and that, therefore, we should review for abuse of discretion and harmlessness. But his objection had nothing to do with the elements of the crime, and therefore this portion of the jury instructions is also reviewed for plain error. *See United States v. Neal*, 578 F.3d 270, 272 (5th Cir. 2009) ("To preserve error, an objection must be sufficiently specific to alert the district court to the nature of the alleged error and to provide an opportunity for correction.").

have been indicted or convicted on Count Two. The reason for this conclusion is simple: by changing "for the purpose of" to "with a motivating purpose of," Congress actually *lowered* the government's burden of proof.[5] So, if anything, by using the outdated language, the government actually made it more difficult to indict or convict Boukamp than it should have been, yet the government obtained both indictment and conviction under this improperly heightened standard anyway.

Perhaps recognizing this fact, Boukamp points out that, after misstating the second element of the offense, the jury instructions for Count Two explain that "[t]he Government does not have to show that the Defendant's only purpose in traveling in interstate commerce was to engage in illicit sexual conduct, but the Government must show that it was *one of the motives or purposes* for the travel. In other words, the Government must show that the Defendant's criminal purpose was not merely incidental to the travel." So, Boukamp argues, even if the 2018 amendment "acted to lower the government's burden under § 2423(b)," by listing "motives or purposes" in the disjunctive, "the court provided the government with an even lower burden [than under the amended statute]: prove one illicit motive

---

[5] Another way to view this change is that Congress was simply bringing the statutory text into conformity with how it was being interpreted in the federal courts. As the government points out, prior to the 2018 amendment, this court and others had already construed the "for the purpose of" language in § 2423(b) as only requiring proof that "one of the defendant's motives in traveling in foreign commerce was to engage in a sexual act with a minor." *United States v. Garcia-Lopez*, 234 F.3d 217, 219 (5th Cir. 2000); *see also United States v. Pepe*, 81 F.4th 961, 978 (9th Cir. 2023) (noting that the Ninth Circuit had "approved 'motivating purpose' as an instruction for § 2423(b)'s mens rea requirement for the pre-2018 version of the statute" and suggesting that Congress may have amended the statute "to clarify and confirm what had always been true—that a 'motivating purpose' is sufficient for conviction").

or one illicit purpose."[6] But we have previously explained that "'dominant motive' is equated with 'motivating purpose,' and if a particular purpose is not motivating, then it is merely non-existent or incidental." *Garcia-Lopez*, 234 F.3d at 220. Instructing the jury that the government needed to show that illicit sex was "one of the motives or purposes for the travel" and "was not merely incidental" fully comported with this precedent. And even if it did not, Boukamp could not have shown prejudice from the error because, for all the reasons explained with respect to Count One, the record makes abundantly clear that Boukamp took M. back to Michigan with a motivating purpose of engaging in illicit sexual conduct.

## E.

Next, Boukamp claims that the district court violated his Confrontation Clause rights by restricting his ability to impeach M.'s testimony on three topics: (1) M.'s role in planning the trip to Michigan; (2) her ability and desire to escape while in Michigan; and (3) the circumstances surrounding the removal of her braces. The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to cross-examine the witnesses against him to test "the believability of [the] witness[es] and the truth of [their] testimony." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). To establish a Confrontation Clause violation, Boukamp must show that "a reasonable jury might have received a significantly different impression of the witness's credibility had [Boukamp] been permitted to pursue his proposed line of cross-examination." *United States v. Skelton*, 514

---

[6] Boukamp *did* object to this portion of the jury instructions at trial, but his objection had nothing to do with the disjunctive "motives or purposes" language he now challenges. Rather, he objected on the basis that the instruction should say "*the primary motive or purpose.*" Because the objection below did not give the district court the opportunity to correct the error Boukamp now raises, we review for plain error. *See Neal*, 578 F.3d at 272.

No. 22-11035

F.3d 433, 439–40 (5th Cir. 2008) (alterations adopted) (quotation marks and citation omitted). If a Confrontation Clause violation is found, it is subject to harmless-error review in light of "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* at 440 (quotation marks and citation omitted).[7] And even if a Confrontation Clause violation is not found, the court's restrictions on cross-examination are subject to review for abuse of discretion, "which requires a showing that the limitations were clearly prejudicial." *Id.* at 438.

1.

Beginning with M.'s testimony concerning her role in planning the trip to Michigan, Boukamp takes issue with the district court's interjection during the following exchange:

Boukamp:　Did you not like your home?

M.:　To a certain point, no.

Boukamp:　You described it as a dumpster fire; is that correct?

---

[7] The government claims that plain-error review applies because Boukamp did not raise any Confrontation Clause objection to the district court's restrictions on his cross-examination below. But as Boukamp points out, the cases the government relies upon for this standard are factually distinguishable. For example, *United States v. Acosta*, 475 F.3d 677, 680 (5th Cir. 2007), concerned the defendant's failure to raise a Confrontation Clause objection to the *government's* questioning, evidence, and elicited testimony whereas here, the Confrontation Clause issues concern the *government's* objections to *Boukamp's* cross-examinations that were sustained by the court. Ultimately, however, we need not decide which standard of review applies because even under Boukamp's proposed standard, his claim fails.

M.:          Yes.

Boukamp:      Did you want to be somewhere else?

M.:          Not really.

Boukamp:      So you took active steps to be with me though. That's somewhere else; is that correct?

M.:          Can you repeat your question, please?

Boukamp:      You took active steps to be with me. That's somewhere else; is that correct?

M:          But you were helping me. Right? To—

Boukamp:      Absolutely.

The Court:    Next question. And, [M.], while he's looking for his next question, if you need a break at any moment, just let me know. Okay?

M.:          Okay.

The Court:    All right.

As Boukamp tells it, the district court's comment "came at a critical juncture when Mr. Boukamp was beginning to impeach M. about her role in planning the trip" and "Boukamp was never able to reestablish this line of questioning." But the record tells a different story. In the questioning that followed, Boukamp elicited extensive testimony from M. to the effect that she was a willing participant in running away with him. She admitted that, in the lead-up to their rendezvous, she had told Boukamp that she wanted a life with him and that she loved him, that, on the morning Boukamp picked her up, she was "happy, bubbly, singing," and that, when they met for the first time, they were laughing and holding hands. This testimony gave the jury a basis upon which to question M.'s testimony that she was taken against her will, and there is no reason to believe that the jury's impression would have been any different absent the district court's brief interruption.

No. 22-11035

And as for Boukamp's contention that the district court's comment "was without purpose other than to disrupt a ripe opportunity to impeach M.," the assertion is as wrong as it is callous. During a brief lull while Boukamp was "looking for his next question," the district court took the time to remind a 15-year-old girl who was directly answering questions from the man who allegedly psychologically tormented and raped her that she could take a break if she needed to. There was simply no error, much less any abuse of discretion, in extending her this basic courtesy.

### 2.

With respect to M.'s testimony concerning her ability and desire to escape while in Michigan, Boukamp's complaint again stems from a single exchange during M.'s cross-examination:

Boukamp:    So when my brother's friends were there, how long were they there for?

M.:    From what I remember, probably three days maybe.

Boukamp:    And you talked to them?

M.:    Yes.

Boukamp:    Do you remember any of their names?

M.:    No.

Boukamp:    Do you remember when I went to get you knitting supplies?

M.:    Yes.

Boukamp:    Do you remember me taking you with me into town?

Government: Objection; cumulative.

The Court:    Sustained. So I know the point you're trying to make. You have made them through other multiple other examples.

Boukamp:    It's—

The Court:    I've sustained—I've sustained the objection. You can try another one. But the rule of cumulative evidence is, if you've made the point multiple times, it becomes cumulative, and I have to control the process of the trial and the pace of the trial. Next question. So formulated questions, you know, to a point, fine. But do you remember, do you remember, do you remember, that's cumulative. Go ahead. Next question, if you have any.

Boukamp:    I'm trying to paint the story, Your Honor. I really was.

Do you remember when I took you to the park and you sat there for a while?

Government: Objection; cumulative.

The Court:    Sustained.

Boukamp:    While you were at the park, how long was I gone?

M.:    Probably 30 to 45 minutes.

Boukamp:    And you sat on the swings; is that correct?

M.:    Yes.

Boukamp:    And this is a public park?

Government: Objection; cumulative.

The Court:    Sustained.

Boukamp contends that these questions were "essential" because "he had only previously elicited testimony that M. had unsupervised access to a phone and laptop" at the lake house as opposed to in public. But as with

the testimony concerning their runaway, Boukamp was able to elicit substantial testimony to make the point that M. did not try to escape while in Michigan despite having repeated opportunities to do so. For example, Boukamp had already established that his brother's friends—who were government officials—came to the lake house to hunt, that Boukamp went hunting with them one day, leaving M. alone with Boukamp's laptop and the password to access it, and that a landline phone was in the lake house, but that M. did not email or call anyone for help during the time she was alone. And Boukamp attempted to persuade the jury in closing argument that, while he and M. were in Michigan together, "[M.] had the option to leave at any time," noting that there were "three government employees staying at [Boukamp's] house [who] were armed [and whom] [M.] spoke to"—facts which, Boukamp argued, were impossible to "reconcile . . . with the government's narrative." Thus, M.'s testimony on this topic had been sufficiently and extensively examined, even without the additional lines of questioning that Boukamp was prohibited from pursuing. There was therefore no Confrontation Clause violation.

3.

As for M.'s testimony concerning the removal of her braces, again Boukamp's Confrontation Clause argument focuses on a single exchange during M.'s cross-examination:

> Boukamp:     Do you remember extensively researching this topic beforehand about how to take your braces off by yourself?
>
> M.:     No, I don't think I did that.
>
> Boukamp:     Your father said that you Google-searched how to take your braces off.
>
> Government: Objection; hearsay.

No. 22-11035

The Court:    Sustained.

Boukamp:    This was in testimony, Your Honor.

The Court:    You can ask her if she remembers. She said she didn't remember. Next question.

As an initial matter, it appears that the district court properly sustained the objection because M.'s father did not testify as to what was in M.'s Google search history. During cross-examination, Boukamp asked M.'s father, "And you also found later that she intended to actually take the braces off herself, based on her Google search history; is that correct?" To which M.'s father responded, "I don't know what the intentions were based on just what the history of the Google was." So, M.'s father never confirmed what M.'s Google search history showed—only that he did not know what her intentions were with respect to her braces.

In any event, the court's instruction for Boukamp to move to the "next question" did not prevent Boukamp from cross-examining M. further on this topic. While M. could not remember whether she Googled how to remove her braces, there was other evidence in the record that suggested she was interested in removing them herself. Indeed, M. had written to Boukamp about wanting to "rip them off" herself and that they would "have to take [the braces] off like asap" (as soon as possible) once they were together. That Boukamp failed to ask M. about this record evidence is no fault of the district court.

Finally, even if the district court did violate the Confrontation Clause by restricting Boukamp's cross-examination of M. on this topic—which it did not—the violation was harmless. As the government explained during trial, the question of whether Boukamp removed M.'s braces against her will was relevant to the second element of the cyberstalking charge, which required the government to prove that Boukamp engaged in electronic

communications with M. "with the intent to injure, harass, and intimidate" her. But even without any evidence concerning the removal of M.'s braces, there was still plenty of evidence—namely, the extensive psychological and sexual trauma that Boukamp inflicted upon M.—of Boukamp's intent to injure. For the same reason, any error in the district court's instruction for Boukamp to move on to the "next topic" while attempting to cross-examine M.'s father about her braces was harmless as well.

## F.

Next, we address whether the district court's denial of Boukamp's motion to continue the trial date warrants reversal. On May 11, 2022—with his trial set to begin on June 14, 2022—Boukamp filed a motion to continue the trial to July 11 at the earliest, but "preferably . . . later in July or early August," so that he could have time to thoroughly review the discovery produced to him by the government. The court denied Boukamp's motion, noting, among other factors, that the court had ensured that Boukamp had sufficient access to the discovery documents and that the court's trial schedule over the coming months was already full.

"Trial judges have broad discretion in deciding requests for continuances." *United States v. Stalnaker*, 571 F.3d 428, 439 (5th Cir. 2009). Accordingly, even when a denial of a continuance is "harsh," we will reverse "only when the district court has abused its discretion and the defendant can establish that he suffered serious prejudice." *United States v. Sheperd*, 27 F.4th 1075, 1085 (5th Cir. 2022); *see also United States v. Hughey*, 147 F.3d 423, 431 (5th Cir. 1998) ("If the challenged decision is neither arbitrary nor unreasonable, we must uphold the trial court's decision to deny the continuance, even when we consider the decision to be a harsh one."). When determining whether the denial of a continuance was an abuse of discretion, we consider "the totality of the circumstances," including "(1) the amount

of time available [to prepare for trial]; (2) the defendant's role in shortening the time [available]; (3) the likelihood of prejudice from denial; (4) the availability of discovery from the prosecution; (5) the complexity of the case; (6) the adequacy of the defense actually provided at trial; (7) the experience of the attorney with the accused; and (8) the timeliness of the motion." *Sheperd*, 27 F.4th at 1085 (quotation marks and citations omitted).

Boukamp's strongest argument concerns the availability of discovery documents. Indeed, the government readily admits that Boukamp faced issues in obtaining discovery from the prosecution. As the government explained in its own motion for a continuance, when Boukamp was represented by counsel, discovery had been provided to his attorneys in unredacted form. But with Boukamp proceeding *pro se*, certain information in the discovery documents—such as identifying information of M. and other minors—needed to be redacted before the government could provide the documents to Boukamp, and still other information—such as the pornographic images retrieved from Boukamp's cellphone and records from M.'s forensic examination—would be contraband in prison, and, thus, Boukamp could only review them at the U.S. Attorney's Office or at an FBI location.

However, the issues concerning access to discovery were quickly resolved. By the time Boukamp filed his own motion for a continuance, he was in possession of both printed and electronic copies of the redacted discovery documents, had already had one opportunity to review the more sensitive discovery materials at the U.S. Attorney's Office, and was scheduled to have four more opportunities to do so before trial. Also, the district court had entered an order requiring the prison to allow Boukamp at least ten hours of computer access each week so that he could review discovery.

Although Boukamp's access to discovery materials was still far more restricted than it would have been if he was not incarcerated or if he was represented by counsel, the district court had made sure that Boukamp was well aware of these restrictions *before* he was permitted to proceed *pro se*. At the *Faretta* hearing, the court explained to Boukamp:

> [A]s your own attorney, you're limited to whatever resources you have, and that's—that's the reality of it. I understand that you might wish to have more access to certain items, but that's the way it goes. Your attorneys here are outside [of jail]. They have got the resources of computers, books, everything at their access. So that's another factor for you to consider as to whether you wish to represent yourself. . . . You understand better than I do what [resources] you have access to [in jail]. . . . [W]hatever resources you have, you're basing your decision [to proceed *pro se*] on that knowledge.

Boukamp chose to proceed *pro se* notwithstanding, and with full knowledge of, these limitations. So, while this factor favors Boukamp, it carries much less weight than Boukamp contends.

Two other factors also weigh slightly in Boukamp's favor. There is no doubt that his motion was timely, as it was filed one week after the trial date was set and contemporaneously with the government's own motion for a continuance. And certainly, sixteen criminal counts charged under six different federal statutes could be considered complex, especially for a *pro se* defendant. But beyond the sheer breadth of Boukamp's alleged offenses, there were no other complicating factors—such as other defendants or novel questions of fact or law—that would have made Boukamp's trial preparations particularly arduous. And in any event, neither of these factors weighs strongly enough in Boukamp's favor to suggest that the district court abused its discretion in denying a continuance.

No. 22-11035

Any lingering doubt about the district court's continuance denial is resolved by considering the other factors, which weigh in favor of affirmance.

Boukamp was permitted to proceed *pro se* on May 4, 2022, and trial was initially set for June 6, 2022 before being continued to June 14, 2022. So, Boukamp had approximately forty days to prepare for trial. We have previously upheld denials of continuances where *pro se* defendants had as little as twelve and eight days to prepare for trial. *United States v. Hoenig*, 79 F. App'x 8, 9 (5th Cir. 2003) ("[The defendant] had 12 days from the court's grant of his motion to proceed pro se until his trial."); *United States v. Whitman*, No. 99-21067, 2001 WL 360789, at *3 (5th Cir. Mar. 20, 2001) ("[The defendant] did not make an unequivocal request to proceed pro se until eight days before trial."). Accordingly, the fact that Boukamp had only forty days to prepare does not suggest that there was any abuse of discretion in denying a continuance here.

That becomes even more true when we consider that Boukamp was first indicted on December 9, 2020. The only differences between the initial indictment and the October 13, 2021 Second Superseding Indictment on which Boukamp was tried were that the latter expanded the enticement count to include attempted enticement, added a second count of receipt of child pornography, and also added ten counts of production/attempted production of child pornography. Critically, from the date of his initial indictment through the day he decided to proceed *pro se*, Boukamp was represented by counsel. So, in addition to the forty days Boukamp had to prepare to proceed *pro se*, he had the benefit of seventeen months of his attorneys' work on the initial indictment and seven months of his attorneys' work on the Second Superseding Indictment. *See United States v. Sarabia*, No. 20-50438, 2021 WL 3775210, at *2 (5th Cir. Aug. 25, 2021) ("[T]he amount of time available to prepare his defense cannot be limited to the time from when [defendant] began representing himself."), *cert. denied*, 142 S. Ct. 1174 (2022); *Hoenig*, 79

F. App'x at 9 (accounting for the fact that a defendant who eventually proceeded *pro se* "had the benefit of counsel for over four months previously"); *Whitman*, 2001 WL 360789, at *3 (noting that the *pro se* defendant "received the benefit of all the work that [his attorney] had done to prepare for the trial"). Additionally, Boukamp's attorneys represented during the *Faretta* hearing that, although they would no longer be counsel of record if Boukamp proceeded *pro se*, they would continue to assist Boukamp and provide him with legal advice.

What is more, Boukamp played a significant role in creating the truncated trial-preparation period that formed the basis of his request for a continuance. *See Sarabia*, 2021 WL 3775210, at *2 (noting that defendant "created the situation he now complains of by switching lawyers three times and then deciding to represent himself"). As Boukamp told the court during his *Faretta* hearing, in the preceding year-and-a-half, he had "gone through three" attorneys, and his own counsel suggested it was more like "five or six." And while Boukamp attempted to claim that he was cycling through attorneys because he could not find any that were willing to "take legal risks that could potentially jeopardize how the Court perceives them and how their professional reputation is in general," he did recognize that "I'm probably the problem." The district court was under no obligation to provide Boukamp with more time just because it took Boukamp until forty days before trial to decide that he was "the only one that [could] really put himself out there" and pursue the legal theories that he wanted to advance.

As for prejudice, which we consider along with the adequacy of the defense and the experience of standby counsel, Boukamp points to moments during the trial where he struggled with accessing evidence and exhibits. But overall, Boukamp was able to cogently present his case to the jury. Indeed, at the close of trial, the judge told Boukamp that he was "the best prepared" and "the smartest" *pro se* defendant that the judge had seen in his career "by

far," noting that Boukamp "made valid objections" and "lucid points and arguments." And the record shows that these comments were far from empty platitudes. Moreover, Boukamp had the benefit of the federal public defender as standby counsel—a factor that this court has recognized further counsels against a finding of abuse of discretion. *See, e.g.*, *id.* at *1 (finding no abuse of discretion in denying request for continuance where "[s]tandby counsel was present throughout discovery and at trial"). Overall, when it comes to prejudice, the unfortunate reality for Boukamp was that, even if he had years to prepare for trial and had presented his case without a single hiccup, the government's case against him was overwhelming.[8]

## G.

Next, we consider Boukamp's argument that even if no individual error warrants reversal, we should still reverse on the basis of cumulative error. Under the cumulative-error doctrine, "an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998). But cumulative error justifies reversal only in the "rare instances" where the errors "so fatally infect the trial that they violated the trial's fundamental fairness." *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc) (citations omitted). And application of the doctrine "is especially

---

[8] Although it does not fit neatly within one of the eight *Sheperd* factors, it bears mention that the district court's packed trial schedule for the upcoming months was, itself, a valid reason for denying the motion. *See Sarabia*, 2021 WL 3775210, at *2 ("[T]he district court's insistence on an expeditious trial, after granting several continuances and recognizing that further rescheduling would interfere with other scheduled trials, was a valid interest."); *United States v. Pollani*, 146 F.3d 269, 272 (5th Cir. 1998) (noting that the district court had a valid "interest in maintaining its docket and keeping cases on schedule").

uncommon where, as here, the government presents substantial evidence of guilt." *Id.*

As explained above, Boukamp has shown, at most, two harmless errors—the district court's erroneous jury instructions for Count One and the erroneous jury instructions and indictment for Count Two. But those errors do not merit reversal for the reasons set forth in Section II.D., *supra*, and there are no other errors to add into the cumulative-error calculus. The cumulative-error doctrine is therefore inapplicable here. *See Delgado*, 672 F.3d at 344 ("Delgado has, at most, demonstrated one possible harmless error—the [jury] instruction. As discussed above, this error clearly does not merit the reversal of Delgado's convictions. Because we have rejected her other allegations of error, and non-errors have no weight in a cumulative error analysis, there is nothing to accumulate. Thus, the cumulative error doctrine has no applicability to Delgado's allegations of error.").

## H.

Finally, Boukamp raises two arguments to preserve them for possible future appellate review, as he concedes that both are foreclosed by binding precedent. First, Boukamp's contention that the district court erred by requiring him to testify in a question-and-answer format if he decided to testify on his own behalf is foreclosed by *United States v. Rodriguez-Aparicio*, which held that a trial court has the "discretion to require [a *pro se* defendant's] testimony to be in question-and-answer, rather than narrative, form." 888 F.3d 189, 196 (5th Cir. 2018). Second, Boukamp's claim that the district court erred in permitting him to represent himself at trial is foreclosed by *United States v. Fields*, which held that a trial court has the discretion to permit a competent but mentally ill defendant to proceed *pro se*. 761 F.3d 443, 467 (5th Cir. 2014).

No. 22-11035

## III.

For these reasons, Boukamp's convictions and sentence are AFFIRMED.